Edmund A. **RESTIVO, Jr.**, in His Capacity as General Partner of Sunnybrook Associates

v.

Gerald R. **LYNCH** et al.

No. 96–224–M.P.

Supreme Court of Rhode Island.

Jan. 29, 1998.

---

2. Marshall does not explain, however, how the application of Vermont law would change the result in this case.

Michele A. Almon, Michael P. Donegan, Philip W. Noel, Providence, for Plaintiff.

William Conley, Jr., Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the petition for certiorari of Edmund A. Restivo, Jr. (petitioner), in his capacity as general partner of Sunnybrook Associates, following a Superior Court judgment affirming a decision of the East Providence City Council (council). In that decision, the council denied the petitioner's request for approval of a subdivision of land in East Providence, Rhode Island. For the reasons set forth below, we deny the petition for certiorari. A summary of the facts pertinent to our decision follows.

### Facts and Procedural History

Sunnybrook Associates (Sunnybrook), a Rhode Island general partnership, owns a certain parcel of real estate known as Sunnybrook Estates. On or about August 4, 1993, Sunnybrook submitted a petition seeking approval of a proposed subdivision of Sunnybrook Estates to the city clerk of the city of East Providence (city). Because of concerns about the adequacy of the proposed drainage system for the new development and about the impact of drainage on surrounding property, the city's planning board (planning board), pursuant to § 15–34 of the Revised

Ordinances of the City of East Providence (Rev.Ords.1986, § 30–19) and with the knowledge and approval of the council, requested that Sunnybrook hire the engineering consulting group Camp Dresser & McKee (CDM) to review the proposed drainage system.

After CDM recommended that the planning board deny Sunnybrook's initial engineering version of the proposed subdivision, given CDM's conclusion that existing drainage difficulties in the area would be exacerbated by the development, Sunnybrook began working with CDM and other city professionals in an attempt to address the concerns of the planning board. A revised subdivision proposal containing modified engineering specifications met with the approval of CDM, and on January 10, 1995, again pursuant to § 15–34, the planning board, after hearing testimony of environmental and engineering consultants and area residents and after reviewing written comments of city professionals, voted four to one to recommend approval of Sunnybrook's preliminary subdivision "subject to" seven enumerated conditions set forth in a January 12, 1995 memorandum to the council. On March 7, 1995, the council, acting as the city's plan commission under G.L.1956 § 45–23–19, held a hearing on the proposed subdivision. At the conclusion of the hearing, the five-member council voted unanimously to deny the petition.

On March 27, 1995, Sunnybrook appealed the rejection by respondents, Gerald R. Lynch, Norman J. Miranda, Rolland R. Grant, Robert D. Sullivan and Joseph S. Larisa, Jr., in their collective capacity as the council, to the Superior Court pursuant to G.L.1956 § 45–23–20. Sunnybrook alleged that the denial was arbitrary, capricious, and characterized by an abuse or a clearly unwarranted exercise of discretion, made in violation of the due process requirements of the Rhode Island Constitution and the United States Constitution, and clearly erroneous in view of the evidence on the record. On November 21, 1995, the Superior Court af-

firmed the decision of the council, finding that "there [was] competent evidence upon which the [council] rested its decision." On December 11, 1995, petitioner filed a notice of appeal with this Court,[1] and on April 24, 1996, he filed a petition for issuance of a writ of certiorari. The writ was issued on September 19, 1996, and, following a hearing by a panel of this Court, the case was assigned for full briefing and oral argument.

## Standard of Review

▇ With respect to proceedings on the "Subdivision of Land," § 45–23–20 provides in pertinent part that

"[a]ny person, whether or not previously a party to the proceedings, aggrieved by a decision of a board of review, or by a decision of a plan commission from which no appeal lies to a board of review * * * may appeal to the superior court for the county in which the land is situated * * *. The court shall hear all pertinent evidence and determine the facts, and upon the facts so determined may affirm the decision, or may annul the decision if found to exceed the authority of the plan commission or board of review, or may enter such other decree as justice and equity may require."

It is well settled that the Superior Court does not engage in a *de novo* review of board decisions pursuant to this section. *E. Grossman & Sons, Inc. v. Rocha,* 118 R.I. 276, 284–85, 373 A.2d 496, 501 (1977). Rather, the Superior Court reviews the decisions of a plan commission or board of review under the "traditional judicial review" standard applicable to administrative agency actions. *Id.* at 285, 373 A.2d at 501. Judicial scrutiny on appeal "is limited to a search of the record to determine if there is *any competent evidence* upon which the agency's decision rests. If there is such evidence, the decision will stand." *Id.* at 285–86, 373 A.2d at 501. (Emphasis added.) *See also Lett v. Caromile,* 510 A.2d 958, 960 (R.I.1986) (observing that decision stands if record contains "any

---

**1.** The petitioner's appeal subsequently was dismissed on the holding of *Kirby v. Planning Board of Review of Middletown,* 634 A.2d 285, 289 (R.I. 1993), that, given the absence of a statutory right

of appeal, "we shall review judgments of the Superior Court in planning-board cases only by writ of certiorari."

competent evidence," and noting that trial justice "lacks authority to weigh the evidence, to pass upon the credibility of witnesses, or to substitute his or her findings of fact for those made at the administrative level").[2] This Court's review of the Superior Court decision is limited "to determining whether the trial justice exceeded his or her authority under § 45–23–20." *Kirby v. Planning Board of Review of Middletown,* 634 A.2d 285, 290 (R.I.1993).

## Discussion

The claims raised by petitioner were identical to those put forth before the Superior Court, namely, that the council's decision was arbitrary, and capricious and constituted an abuse or clearly unwarranted exercise of discretion, that the council denied petitioner a fair and impartial hearing in violation of the due process requirements of the Rhode Island and United States Constitutions, and that the council's decision was clearly erroneous in view of the evidence on the record.

In support of his first argument, petitioner maintained that the trial justice "cited but two pieces of competent evidence upon which the Council could have based its decision." The petitioner asserted that, in relying on these pieces of evidence, the trial justice misconstrued the fact that "the pivotal question is not how severe the [water drainage] problem *is* in the area (a factual question), but whether the proposed subdivision will *impact* the drainage problem (an engineering question)." We disagree with petitioner's characterization of the "pivotal question" before the trial justice, who did not err in arriving at her decision.

The trial justice addressed the following evidence that was adduced at the council hearing. First, she observed that petitioner's expert, Scott Moorehead (Moorehead), an engineer and professional land surveyor, "conceded that the potential for ground water basement flooding in this particular subdivision was the worst he had worked on for such a wide area." Moorehead's testimony was unequivocal on this point. At the hearing before the council, the following colloquy occurred between Moorehead and a council member:

"Q. Mr. Moorehead, have you been associated with any proposed developments where the potential ground water basement flooding before the development was built appeared to be worse than the situation here?

"A. Where the existing condition was worse than this?

"Q. Yes.

"A. I cannot think of one where it was worse on such a wide area."

Second, the trial justice pointed out that "members of the Council also based their decision on personal knowledge of the poor drainage history of the proposed site." The trial justice correctly cited our decision in *Perron v. Zoning Board of Review of Burrillville,* 117 R.I. 571, 576, 369 A.2d 638, 641 (1977), in which we held that evidence gleaned from the personal observations of zoning board members constituted "legally competent evidence upon which a finding may rest * * * if the record discloses the nature and character of the observations upon which the board acted." *See also Dawson v. Zoning Board of Review of Cumberland,* 97 R.I. 299, 302–03, 197 A.2d 284, 286

2. The dissent fails to recognize an important distinction in citing to our decision in *Salve Regina College v. Zoning Board of Review of Newport,* 594 A.2d 878 (R.I.1991). Whereas a trial justice reviewing the decision of a planning commission or board of review pursuant to G.L.1956 § 45–23–20 must affirm the decision of a planning commission or board of review if "any *competent* evidence" exists on the record to support the decision, *see ante,* a trial justice reviewing the decision of a *zoning* board of review operates under a different standard. As the Court correctly observed in *Salve Regina,* a trial justice conducting the latter review "must examine the entire record to determine whether 'sub-stantial' evidence exists to support the board's findings." *Id.* at 880 (quoting *DeStefano v. Zoning Board of Review of Warwick,* 122 R.I. 241, 245, 405 A.2d 1167, 1170 (1979)). (Emphasis added.) In granting the petition for certiorari (thereby reversing a Superior Court judgment that affirmed the zoning board's denial of the petitioner's application for a special zoning exception), the *Salve Regina* Court specifically held that the zoning board's denial "constituted an abuse of discretion by the board and [that] its findings were clearly erroneous in view of the reliable, probative, and *substantial evidence* of the whole record." 594 A.2d at 882. (Emphasis added.)

(1964) ("when a board of review has made an inspection of premises and disclosed in the record the conditions and circumstances it observed * * * this court will treat such conditions and circumstances so disclosed * * * as constituting legal evidence capable of sustaining a board's decision in an appropriate case"). The trial justice found, and petitioner's counsel conceded at oral argument, that council members may rely on their own expertise to the same degree and under the same conditions as can members of a zoning board. Contrary to the assertion that the council members here "didn't make any observations" that met the *Perron* standard, our review of the record revealed that several council members made detailed personal observations. For example, Councilman Miranda stated that he and Councilman Sullivan had traveled to the area of the proposed subdivision on an occasion two days after a rainfall, "and there was no doubt in my mind that that land was [still] wet." Several members of the council reported their personal knowledge that the area of the proposed subdivision was a high-density water area and that neighbors in the area had experienced flooded basements and had expressed concerns about any proposed development in the area. Moreover, Councilman Sullivan disclosed that he had walked the neighborhood in the past and familiarized himself with the problems of the residents in that area.

"I have seen it with my own eyes. They get up during the middle of the night. They open their doors. They see children's toys floating around their cellars. They have the tiles in the basement floor lifted up. They have their rugs curled. They have furniture in and around the area destroyed. Is there a guarantee the city council will give them by approving this subdivision here tonight that those concerns and fears of the neighborhood would be taken care of, I don't think so."

■ The Superior Court's review of the decision of a board of review or plan commission is circumscribed and deferential as foreordained by our pronouncement in *Grossman* that "judicial scrutiny of an agency's factfinding * * * is limited * * * to determin[ing] if there is *any competent evidence* upon which the agency's decision rests." *Grossman*, 118 R.I. at 285–86, 373 A.2d at 501. Moreover, "the trial justice's review should [be] restricted to a search of the record * * * and the search should [be] *limited to the discovery of the necessary competent evidence.*" *Id.* at 286, 373 A.2d at 501. (Emphases added.) Contrary to petitioner's explicit and implicit assertions, neither § 45–23–20 nor our interpretation thereof in *Grossman*[3] requires that a trial justice identify and cite *all* competent evidence in the record upon which a decision is based, nor do they limit "competent evidence" to evidence that establishes unequivocally that a proposed development will have deleterious effects on the surrounding area. *Cf. Grossman*, 118 R.I. at 279, 373 A.2d at 498 (holding that an aggrieved party is "not required to prove that his property would in fact suffer the requisite degree of harm before he [can] seek judicial assistance") (citing

---

3. In *E. Grossman & Sons, Inc. v. Rocha*, 118 R.I. 276, 373 A.2d 496 (1977), a planning board of review granted property owners' appeal of the approval of a proposed subdivision of property abutting their land. This Court vacated a trial justice's ruling that overturned the planning board's decision to grant the appeal. *Id.* at 288, 373 A.2d at 502. In that case, the owners of a farm that abutted a proposed subdivision plat contended that the subdivision proposal that had been approved by a planning board did not provide adequate drainage and failed to afford protection to them from the effects of surface-water runoff onto their farm. *Id.* at 278, 373 A.2d at 498. We found "an abundance of competent evidence to support the review board's finding as to the lack of controls regulating the surface flowage from [the proposed subdivision] onto the farm." *Id.* at 287–88, 373 A.2d at 502. Notably, the Court identified as "abundant" three pieces of evidence: the fact that the planning board which approved the subdivision had assumed that the engineer who testified in favor of it had based his assessment on the calculation of a twenty-five-year rainfall, whereas he had only utilized a fifteen-year rainfall; the testimony of the son of the farm owners, stating that the construction of nearby housing developments had resulted in the decreased ability of adjoining land to hold water and that he believed the proposed subdivision would adversely effect the value of his parents' farm; and the admission of the engineer that, as a result of the proposed subdivision, more water would end up on a buffer strip intended to prevent seepage onto the farm owners' land. *Id.* at 286–87, 373 A.2d at 502.

*Jeffrey v. Platting Board of Review of South Kingstown*, 103 R.I. 578, 239 A.2d 731 (1968)); *see also Zimarino v. Zoning Board of Review of Providence*, 95 R.I. 383, 386, 187 A.2d 259, 261 (1963) (defining "reasonably competent evidence" upon which administrative boards may rely as "any evidence that is not incompetent by reason of being devoid of probative force as to the pertinent issues").

The dissent's citation to *Jeffrey v. Platting Board of Review of South Kingstown*, 103 R.I. 578, 239 A.2d 731 (1968), is misleading in this regard. The *Jeffrey* Court addressed whether a planning board had abused its discretion when it approved a proposed subdivision plan. The planning board had recommended to its city council that the existing zoning requirement that proposed subdivisions average 20,000 square feet be increased to 80,000 square feet. The planning board then approved the subject proposed subdivision that averaged 40,000 square feet. *Id.* at 581, 239 A.2d at 734. We upheld the planning board's decision, noting that the board had approved the subject proposal before the city council had voted to change the zoning regulation. *Id.* at 587, 239 A.2d at 737. It was in the context of the discussion of this narrow issue that the Court reasoned that planning board and city council members must act pursuant to rules and regulations pertaining to subdivisions that they have enacted, "and they have no discretion to disapprove a plat that conforms to those rules."

*Id.* Contrary to the assertion of the dissent, we do not view this language, when considered in its appropriate context, as dictating that a planning board may in no circumstances reject a proposed plan that conforms to existing zoning regulations but might otherwise be problematic.[4] Were we to adopt the dissent's constrained view, we would undermine our holding in *Grossman*, a decision rendered nearly ten years *after Jeffrey*. As noted *ante*, *Grossman* established that "any competent evidence" in the record will obligate a trial justice to affirm a planning board's decision. The *Grossman* Court did not hold, and we decline to so hold today, that a trial justice must affirm a planning board's denial of an application only when any competent evidence exists on the record *and* the proposed subdivision fails to comply with existing zoning regulations.

The evidence specifically referred to in the trial justice's decision as well as additional evidence in the record fully justified the denial of Sunnybrook's proposal for a subdivision that would have intensified the land use in an area plagued with drainage problems.[5] For example, nearby homeowner Donald Barton testified at the council hearing that he experienced chronic problems with basement flooding and poor drainage in his back yard, "especially since the duplexes were added to the end of it." He further testified, contrary to Moorehead's statements to the council, that runoff water does not

4. Although our dissenting brother correctly characterizes *Jeffrey*'s holding as presented in *L.A. Ray Realty v. Town Council of Cumberland*, 698 A.2d 202, 210 (R.I.1997), he again fails to consider the particular and limited context in which *Jeffrey* was cited. In *L.A. Ray*, the citation to and characterization of *Jeffrey* immediately followed our observation that the trial justice's conclusion "that because *the only basis for denial* [of the plaintiffs' subdivision applications] was the application of the town's invalid referendum amendment, [the] plaintiffs were entitled as a matter of law to final approval of those subdivisions." 698 A.2d at 210. (Emphasis added.)

5. As noted *ante*, the planning board recommended that the council approve Sunnybrook's modified proposal only on condition that

"all the items needing correction or clarification raised in the following [specified] technical staff memorand[a] be addressed prior to petition for final plat approval * * * That any variance(s) necessary for construction be

sought and received prior to petition for final plat approval * * * That [Department of Environmental Management] approval be received prior to final plat approval."

The comments in the technical staff memoranda to which the planning board referred included a September 10, 1993 memorandum from Daniel Pennington, Acting City Engineer, to Julia A. Forgue, Director of Public Works, with the observation: "In the past, the issue of groundwater contamination at the site has been raised and reports have been submitted by the developer pursuant to this issue. This office, however, does not possess the expertise necessary to properly evaluate such reports and will not offer opinions as to their content." An August 18, 1993 memorandum from Kenneth B. Booth, Distribution and Collection Superintendent, to Daniel Pennington, noted that "[t]here is no detail plan showing the trench and bedding for the water main."

simply run down the road along which the proposed development would be built, rather "[i]t runs down the road * * * and goes between my house and my next door neighbor who is closer to the development, and it goes into my backyard. From there it can't really go too far until the ground level goes down. So I have a serious problem." Barton related that since the construction of nearby duplexes, every spring the "pond [in my backyard] get[s] bigger and bigger and bigger."

Therefore, on the basis of the record and the well-established standard of review of Superior Court decisions in planning board cases, we hold that the trial justice acted well within the authority conferred by § 45–23–20 in affirming the council's decision.[6]

The petitioner next argued that the council "had concluded prior to the hearing that no further development would be allowed in the area of the proposed subdivision, no matter what project was placed before [it]," and alleged further that the council's "obvious predisposition to deny the Petition [was] in-dicative of a constitutionally defective hearing, violative of the requirements of due process." By implication, petitioner contended, the trial justice erred in not recognizing the alleged due process violation. We find this claim to be without merit.[7]

■ The transcript of the hearing before the council revealed that petitioner's proffered exhibits were accepted into the record without objection and that petitioner presented three witnesses, including himself, who were questioned extensively by council members. Furthermore, it was petitioner's then-counsel who indicated to the council members that petitioner would "not [be] agreeable" to the suggestion of Councilman Sullivan that developers post a ten-year bond "to guarantee the neighbors and the City * * * [that] if they had any increase[d] water problems in that area," the developers would correct them.[8] That the council proposed such an alternative undermines petitioner's contention that the council intended to reject all proposals for development in the area in question in any circumstance.[9] Hence, the

6. The dissent's stated concern that "an open-textured standard for upholding the denial of subdivision applications will all too easily be converted into an impermeable cloak to cover confiscatory regulatory takings, official pandering to neighbors' antidevelopment biases, political shenanigans, and other such local governmental capriciousness of the sort that we recently condemned in *L.A. Ray Realty v. Town Council of Cumberland,* 698 A.2d 202 (R.I.1997)" invites the very "misleading apples-to-oranges comparison" that the majority is chided for sanctioning. Notably, in *L.A. Ray,* this Court held, inter alia, that

"the plaintiff [landowners] were denied substantive due process as a result of the illegal, unauthorized actions by agents of the state acting under color of law. Town officials *illegally altered a referendum* and distributed the 'new,' invalid zoning ordinance to the relevant departments and boards, *violated a Superior Court order* regarding the plaintiffs' right to a hearing, and directly interfered with the plaintiffs' constitutionally protected property interests. Moreover, this egregious conduct was undertaken with *express animus toward the plaintiffs* and without actual or legal basis." *Id.* at 214. (Emphases added.)

Moreover, we expressly "note[d] with particularity that our holding in [*L.A. Ray*] does not portend that every rejection of a development project * * * will support a 42 U.S.C. § 1983 claim," and we observed that "[i]t is evident that this case does not represent the routine developer's claim or zoning denial." *Id.*

7. To the extent that petitioner indirectly raised a claim of a confiscatory taking, we note that other remedies, such as an action in inverse condemnation, are available to him. *See, e.g., Alegria v. Keeney,* 687 A.2d 1249 (R.I.1997) (the plaintiff, whose application for development of property containing wetlands was denied by Rhode Island Department of Environmental Management, brought action in inverse condemnation).

8. Councilman Sullivan stated:

"Your professional opinion may not be good enough for these neighbors. They want a guarantee they are not going to get any more water in their cellars. They want a guarantee they can live in peace. They are not going to wake up in the morning from this subdivision causing problems, and they don't want any more problems coming into the area."

9. Although we express no opinion in respect to petitioner's claim that the council's request for a ten-year bond was "beyond the statutory authority of the council acting in its capacity as Plan Commission Board of Review," we note that the propriety and the necessity for such a request may not be as dubious as petitioner intimates. *See, e.g., Zannini v. Downing Corp.,* 701 A.2d 1016 (R.I.1997) (per curiam) (upholding Superior Court judgment of contempt wherein the appellant failed to comply with Superior Court

trial justice correctly determined that petitioner was given "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Millett v. Hoisting Engineers' Licensing Division of the Department of Labor,* 119 R.I. 285, 296, 377 A.2d 229, 236 (1977) (quoting *Raper v. Lucey,* 488 F.2d 748, 753 (1st Cir.1973)). Consequently, we affirm the trial justice's conclusion that

> "[t]he questions and answers provided demonstrate that members of the City Council carefully considered [petitioner's] proposal at the * * * council meeting. The fact that the council could not be persuaded to approve the project is not violative of due process."

The petitioner's final contention was that the council's decision was clearly erroneous because "the *only* competent evidence on the record relative to the drainage issue," namely, the recommendation of CDM and the testimony of Moorehead, was not "discredited, contradicted, or even questioned," and thus the trial justice erred in failing to acknowledge the council's alleged error. Not only does our discussion of the evidence *ante* refute this claim, but at the hearing before the council, members clearly questioned and discredited the testimony and evidence put forth by petitioner. For example, in response to questioning from one council member concerning the likely result if one of the four catch basins to be built by Sunnybrook were to become clogged with leaves and other debris, Moorehead stated that "[t]here could be street flooding problems, * * * we certainly could end up with some ponding situation within the streets either within the development or out in the intersection with [the main road]."

Moorehead also testified that Sunnybrook's proposal included replacing about 900 feet of the city's existing drains that were only approximately ten years old and had a life expectancy of "30 to 50 years or more," because the existing pipes "are undersized to accept this development." The following discussion took place relative to the replacement of the pipes:

"COUNCILMAN LYNCH: The maintenance of this drainage system, this elaborate system becomes city property, correct?"

"A. The pipe system will become city property as all the other drains in the city.

"COUNCILMAN LYNCH: So that becomes an additional city maintenance?

"A. That is correct.

"COUNCILMAN LYNCH: If it works or doesn't work, we own it, correct? "

"A. You would own it, yes."

Moreover, according to Moorehead, the houses "will all be built slab on grate since we have only two feet to three feet to the ground water table," thereby indicating that basements could not be built. Finally, Moorehead, perhaps with more candor than he intended, revealed, "As I stated, it is my professional opinion this project will not make—*should* not make the [drainage] situation worse and in some instances will actually improve the situation." (Emphasis added.)

Although it is true that Moorehead testified before the council that "reports regarding subdrainage have been reviewed by the city staff and Camp, Dressler [*sic*] & McKee, and they have agreed with our conclusions that it will help alleviate problems and certainly not increase any existing problems that are there," we are of the opinion that the council could accept the assurances of Moorehead and CDM that Sunnybrook's modified proposal would have no deleterious effects on abutting property; equally permissibly, the council could rely on the competent evidence militating against approval of the proposed subdivision plan. We are constrained to point out that in asserting that "no other competent evidence" existed on the record aside from evidence tending to show that the proposed subdivision would not exacerbate, and might alleviate, existing drainage problems, the dissent disregards, for example, Moorehead's testimony that potential street flooding could result from the clogging of the catch basins to be installed as part of the proposed subdivision, and ignores Moore-

order to install one of two specified drainage systems to afford relief to property owner whose land was damaged by surface-water runoff creat-

ed by the appellant's development of adjacent property over ten years earlier).

head's admission to Councilman Lynch that maintenance of the new piping to be installed as part of the proposed subdivision would become the responsibility of the city.

■ Our brother erroneously suggests that only expert testimony could competently establish the probability of the exacerbation or alleviation of the drainage conditions in the area of the proposed development. But there is no talismanic significance to expert testimony. It may be accepted or rejected by the trier of fact, *Kyle v. Pawtucket Redevelopment Agency*, 106 R.I. 670, 673, 262 A.2d 636, 638 (1970); *Cianciarulo v. Tarro*, 92 R.I. 352, 361, 168 A.2d 719, 724 (1961), particularly when there is persuasive lay testimony on the actual observed effects of prior residential construction. The subject matter here was not so arcane that inferences from factual lay testimony could not be drawn by members of the council based, in part, on their own expertise. In *Salve Regina College v. Zoning Board of Review of Newport*, 594 A.2d 878, 881–82 (R.I.1991), we held that lay testimony regarding traffic data was not competent and had no probative force. Here, lay testimony *is* competent in respect to the presence of water in one's basement and such lay testimony describing physical facts and conditions does constitute evidence from which the planning board could fairly draw inferences.

Moreover, the petitioner's assertion that his evidence was not questioned is simply erroneous. After the petitioner's witnesses had testified, Councilman Lynch concluded; "[No developer] has ever been able to come before us and guarantee that [its plan] would not have a reversed [*sic*] effect on the neighborhood. * * * I thought to myself, God, this is the third drainage plan he had presented to us and McKee the same thing. * * * [T]he salesman selling your houses is not going to explain [the problem] to the people buying it * * *. I am not convinced that this would not have an ill effect on the neighborhood." Councilman Larisa stated: "I don't think the problem is the development. * * * The only real basis we have for objecting to this proposal is we are not con-

vinced it wouldn't make the [drainage] problem worse than it is." And the mayor reasoned: "We have had these engineers up before and they have told us the same thing. People still have water in their cellar. So much for that. We have had other people come up and tell us it is going to work out because I got another drain. I got a new idea. It never did."

In conclusion, therefore, in light of the foregoing analysis, we deny the petition for certiorari, quash the writ improvidently issued, and affirm the judgment of the Superior Court, to which the papers in this case may be returned with our decision endorsed thereon.

FLANDERS, Justice, dissenting.

I respectfully dissent because I can discern no competent evidence in the record to support the trial justice's decision to uphold the East Providence City Council's denial of the application of the petitioner, Edmund A. Restivo, Jr., for subdivision approval.

The only legitimate issue presented by this subdivision application was whether petitioner's proposal to subdivide his land into nine house lots would aggravate the undisputed ground-water-drainage problems in this residential area. The only competent evidence before the city council was that it would not. Indeed, the uncontradicted expert testimony was that the new drainage system to be constructed by petitioner would tend to alleviate the existing water problems in the area and that, in any event, the proposed development would not have an adverse impact upon whatever drainage problems presently existed.

Thus, notwithstanding the fact that petitioner's subdivision plat complied with all the rules and regulations enacted by the city pertaining to subdivisions in this part of the city, his application was still rejected even though city council members "have no discretion to disapprove a plat that conforms to those rules." *Jeffrey v. Platting Board of Review of South Kingstown*, 103 R.I. 578, 587, 239 A.2d 731, 737 (1968).[10] Rather

---

10. The majority claims that the dissent's citation to the *Jeffrey* case "is misleading in this regard."

If so, I too have been misled. For I had it on the highest and most recent authority that *Jeffrey*'s

"[t]he approval or disapproval of a subdivision plat is an administrative or ministerial act which effectuates legislative policy." *E. Grossman & Sons, Inc. v. Rocha,* 118 R.I. 276, 284, 373 A.2d 496, 500 (1977).

It is also important to note that the city council did not decide to disapprove this application unless the developer gave a ten-year guaranty in the form of a bond to protect current residents from the subdivision's potential adverse impact on the existing water problems. Rather the council flatly rejected the application without conditioning its approval or disapproval on petitioner's posting of a bond to pay for any water problems caused by the new development or on petitioner's compliance with any other stipulation. Although a council member asked petitioner's engineer whether he was willing to post such a bond, the council's vote was not conditioned in any way on petitioner's willingness or unwillingness to guarantee that existing residents would not suffer additional water problems as a result of the development. In other words, the city council never gave this plaintiff the option of posting a bond or satisfying any reasonable prerequisites as a condition of granting him approval to proceed with the subdivision. Rather, after petitioner stated, "[Y]ou cannot get someone to bond it * * *. It is impossible to measure whether or not someone has additional water problems[,]" the application was flatly denied.[11]

Pursuant to G.L.1956 § 45–23–20, petitioner sought review in the Superior Court. The trial justice's job was to review the record to determine whether any competent evidence existed to support the city council's decision to deny the application. After reviewing the record before the city council, a Superior Court justice pointed to two factors in deciding to uphold the council's decision: first, the

statement by petitioner's engineer that the potential for ground water to flood basements in this location had been the greatest he had seen in such a wide area; second, several council members had personally visited the area where the proposed subdivision would be built and observed homes with water in their basements after a rainstorm.

But the council members' personal observations and knowledge of the existing water problems in this area and the statement by petitioner's engineer acknowledging the area's potential for ground-water problems were hardly probative with respect to the crucial exacerbation issue: would the proposed subdivision pose an unacceptable risk of aggravating the existing water problems in the area, or would it, as the only competent evidence indicated, tend to alleviate the current water-drainage problem? Accordingly the residents and council members' statements about the existing water problems in the area and their fears about what additional development might do to magnify this situation do not constitute competent evidence that the proposed subdivision would only tend to worsen the status quo. *See Salve Regina College v. Zoning Board of Review of Newport,* 594 A.2d 878, 881–82 (R.I.1991) ("Since the testimony offered"— lay opinions concerning potential traffic problems in the area to be developed which were "formed not from an impartial and professional perspective but rather from the perspective of a neighboring property owner who was altogether vehemently opposed to any further student habitation in his own neighborhood"—"was lacking in probative force and since the board had no other expert testimony or evidence in the record adverse to [the applicant] upon which it could base its findings and conclusions, we hold that the trial justice erred in finding that the

"holding [was] that [a] planning board had no discretion to disapprove [a proposed subdivision] plat that conformed to [the] board's rules." *See L.A. Ray Realty v. Town Council of Cumberland,* 698 A.2d 202, 210 (R.I.1997) (Lederberg, J.) (citing *Jeffrey* case for this proposition).

**11.** The petitioner was willing, however, to comply with all bonding requirements mandated by law, including the posting of a performance bond. *See* G.L.1956 § 45–23–6 (authorizing the

local planning authorities to provide for the posting of a bond in lieu of final approval upon completion of the work to secure the actual construction and installation of the promised improvements). But the council denied·the permit after plaintiff's attorney refused to accept an unauthorized request by a council member for a ten-year bond to guarantee that other residents' water problems would not increase at any time during the next decade.

evidence was sufficient to support the board's determination").[12]

The flawed logic supporting the denial of this proposed subdivision is as follows: this area has water-drainage problems; the proposed subdivision will intensify the land use in this area; therefore, the proposed subdivision presents an unacceptable risk that it will aggravate the existing water-drainage problems. The city seems to be under the erroneous impression that the more problems that it can cite showing how poor the existing water-drainage situation is, the more competent is the evidence supporting the council's denial of this subdivision application. But when the city's own experts and applicant's experts have presented competent engineering evidence that the proposed subdivision and its elaborate new drainage system will alleviate these problems—and no other competent evidence contradicts this testimony—I am at a loss to understand how a mere recitation of how bad the current water problems are amounts to competent evidence that allowing the development will tend to worsen the status quo.

If the standard for approving subdivision plans is now to be a 100 percent bonded guaranty from the developer that no problems will ever arise from any of the subsequent development activity for ten years after construction is completed, then no such subdivision will ever be approvable and no denial of such a subdivision—no matter how arbitrary and devoid of competent factual support—will ever be reversible. Unfortunately in this case, that is the effective standard that was applied by the East Providence City Council and upheld by the Superior Court in affirming this denial.

This case raises a very important administrative law question: what evidence (if any) will be deemed competent by a court in reviewing a municipality's rejection of a proposed subdivision plan that otherwise conforms to all the city's applicable rules and regulations? I do not believe that the applicable law grants to municipal authorities a roving commission to deny a permit to a proposed subdivision plat that otherwise conforms to all applicable rules and regulations merely because lay witnesses and members of the permitting authority can articulate some possibility that the development might someday prove to be problematic in some respect. To me, such an approach invites municipal officials to substitute rank speculation and conjectural claptrap for genuine engineering expertise and constitutes an open invitation for local planners to engage in incompetent fear-mongering about perceived or imagined development risks, no matter how unfounded, unlikely, or controllable such risks may be. Such an open-textured standard for upholding the denial of subdivision applications will all too easily be converted into an impermeable cloak to cover confiscatory regulatory takings, official pandering to neighbors' antidevelopment biases, political shenanigans, and other such local governmental capriciousness of the sort that we recently condemned in *L.A. Ray Realty v. Town Council of Cumberland*, 698 A.2d 202 (R.I.1997) (holding that the petitioner property owners had established 42 U.S.C. § 1983 substantive and procedural due-process violations against town officials who arbitrarily

12. The standard of review used by the Superior Court in affirming a municipality's denial of a development permit is irrelevant to whether the evidence relied upon by the municipality to support the denial is legally competent. Although the standard of review may determine what quantum and weight of competent evidence is needed for the municipality's position to be upheld, if the evidence it relies upon is incompetent, then the standard of review will have no impact on the ultimate result. The reason this is so is that if the evidence relied upon by the municipality to justify its denial lacks probative value, then not only will the permit denial fail to pass muster under the "substantial evidence of the entire record" test used to review the denial of zoning applications, *see Salve Regina College v. Zoning Board of Review of Newport*, 594 A.2d 878, 880 (R.I.1991), but it will also fail the "any competent evidence" test that has been used to review the denial of subdivision applications. *See, e.g., Lett v. Caromile*, 510 A.2d 958, 960 (R.I.1986). In any event the anomalous "any competent evidence" standard formerly used by the Superior Court to review municipal decisions on subdivision applications is no more. As of December 31, 1995, § 45-23-20 has been repealed, *see* § 45-23-28(C), and replaced by § 45-23-71, which provides inter alia for Superior Court review "of the reliable, probative, and substantial evidence of the whole record." *See* § 45-23-71(C)(5).

denied the plaintiffs' request for subdivision approval).

Moreover, the mere fact that the municipality might have to maintain the new pumping and drainage system to be installed and paid for by petitioner to realize the expected benefits of this new drainage system cannot be relied upon to constitute competent evidence to support the council's denial. Indeed, this result is no different from what usually occurs after a proposed subdivision has been approved and accepted by the municipal authorities: the platted streets and all related improvements thereon (including catch basins, drainage systems, and culverts) become public property maintainable by the city after they have been constructed and accepted by the city's governing body. *See* § 45–23–10 (although planning-commission approval of a plat shall be deemed public acceptance of the street, future maintenance and improvement duties require authorization from the municipality's governing body). Additionally, I do not believe that prospective maintenance concerns about the proposed new drainage system constituted competent evidence to support the city council's denial of this petitioner's subdivision application. Here, there was no evidence presented concerning how significant or substantial this cost would be or even that it would be any more burdensome to the city than its customary maintenance of other city streets and drainage systems. It is worth recalling that this is the same drainage system that was approved by the city's public works department, by its planning board, and by its engineers and, according to all the experts, would alleviate the existing water-drainage problems besetting this area of the city. And yet we are told that because the city would have to maintain this new drainage system (for example, by keeping the new catch basins from clogging up with runoff debris), competent evidence thereby exists to support the denial of subdivision approval. But shall municipalities hereafter be able to claim in other subdivison cases that competent evidence exists for the municipality to reject a proposed subdivision because the platted streets shown thereon may someday develop potholes if they are not properly maintained by the municipality in the future? Given the alleged extent and gravity of this area's existing water problems, the city's future maintenance argument rings as hollow to me as a drowning man's rejection of a proffered lifeline on the grounds that he may have to maintain his grip on the rope if he is to be pulled to shore.

Finally, it has been argued that the evidence presented to the city council concerning the actual observed effects of prior residential construction on the water situation in this area constituted "persuasive lay testimony" about the deleterious effects of allowing further development in this area. But there was no probative evidence introduced to indicate that any of these other obliquely referenced construction projects included any substantial efforts at all to address the water-drainage situation. Nor was there any suggestion that these other developments incorporated the same or a substantially similar type of comprehensive water-drainage system that was an integral part of this subdivision proposal. Accordingly, such unfounded anecdotal statements by lay witnesses and council members only served to showcase the type of incompetent evidence on which this permit denial was bottomed, and this court should be loathe to bestow a mantle of competency upon such invidious comparisons with the subject proposal. Indeed, to hold aloft this type of anecdotal fluff as a shining example of "persuasive lay testimony" is to debase the kind of scientific causation evidence that courts should deem competent to buttress the denial of a subdivison application. Worse, it sanctions the use of misleading apples-to-oranges comparisons by incompetent lay witnesses to support a municipality's arbitrary denial of such approvals. Even the trial justice—whose obligation to scour the municipal record for any morsel of legally sufficient evidence led her to believe (erroneously) that council members' personal observations of existing wet basements constituted competent evidence to deny this permit—did not see fit to claim any probative value whatsoever for incompetent lay opinions about the allegedly causal effects of prior residential construction on the ground-water situation in this area.

To be sure, the city council was free to reject all the expert testimony—including that of its own experts—to the effect that the proposed subdivision's new drainage system would in all likelihood help to alleviate the existing water problems in this area. But it gains nothing by doing so because, after rejecting the only competent evidence before it, the council was still left holding nothing but a porous evidentiary ragbag bursting with incompetent lay opinions and its own unfounded trepidations about whether the proposed drainage system would really perform as the city's own engineers assured council members that it would. I also believe that when it comes to assessing whether a proposed water-drainage system will technically perform as designed, expert testimony does indeed have talismanic significance in the sense that, as contrasted with uninformed lay opinions and the conjuring-up of hypothetical bogeymen, it alone is competent to address this subject with any probative force.

In sum, because the record is barren of any competent evidence to support the city council's denial of the subdivision approval, I believe the trial court misapplied the law, misconceived the evidence, and overlooked the absence of any factual support in the record for the proposition that the proposed subdivision presented an unacceptable risk of aggravating the existing water problems in the area. Indeed, the only competent evidence before the city council, as confirmed by the very engineering firm hired by the city to assess this situation, stated precisely to the contrary.

For this reason I would grant the petition for certiorari, quash the Superior Court's affirmance of the city council's decision to deny the subdivision, and remand this case to the Superior Court for the entry of a judgment ordering the approval to be issued.