DECISION
Before the Court are consolidated appeals from six separate decisions of the Pawtucket Zoning Board ("Board") denying plaintiff Churchill 
Banks Ltd.'s request for six special use permits for a proposed development in Pawtucket. This Court has jurisdiction of the action pursuant to G.L. 1956 § 45-24-69.
 Travel/Facts
The plaintiff, Churchill Banks Ltd. (Churchill) is a developer with plans to convert three lots into a Super Stop Shop complex. The lots, located at 314 Woodbine Street, comprise approximately fifteen acres and are identified as Pawtucket Assessor's Plat 9A, Lots 124, 537, and 564. The Super Stop Shop is permitted and may be built in the absence of any approval from the Board. However, Churchill seeks approval from the Board for special use permits for further development of the site to include two restaurants, with one restaurant containing a drive-thru window; a gas station; a multi-tenant commercial structure; and a drive-thru window for the pharmacy at the Super Stop Shop. Recently, the area was rezoned as "Commercial General" from its previous classification of "Industrial Open" and "Multi-Family Residential" zones.[1]
On September 19, 2000, the Pawtucket City Planning Commission held a public hearing to consider the site plan of the development proposed by Churchill. Churchill submitted a detailed description of the proposed project, as well as recommendations for off-site improvements, such as the addition of left-turn lanes at the entrances to the site and improving the traffic light signal system.
Thereafter, the planning commission voted unanimously to approve the project.
After receiving site plan approval, Churchill petitioned the City of Pawtucket Zoning Board of Review (the Board) for the following six special use permits: (1) A special use permit authorizing a drive-through window to service a pharmacy within the Super Stop Shop store (C.A. No. 00-5824); (2) a special use permit authorizing a drive-through window to service a fast-food restaurant (C.A. No. 00-5825); (3) a special use permit authorizing a gasoline service station (C.A. No 00-5826); (4) a special use permit authorizing a multi-tenant commercial structure (C.A. No. 00-5827); (5) special use permit authorizing a fast-food restaurant covering 3,600 square feet of ground floor (C.A. No. 00-5828); and (6) a special use permit authorizing a a sit-down restaurant covering 5,000 square feet of ground floor (C.A. No. 00-5829).
The Board received written advisory opinions, recommending approval of all six special use permit applications from the Pawtucket Department of Planning and Redevelopment. The advisory
opinions conclude that each special use permit "will not alter the general character of the surrounding area or impair the purpose of zoning or the Comprehensive Plan."
A hearing was held before the Board on September 26, 2000 and Churchill presented expert testimony in support of each special use permit application (to be discussed infra). Churchill also presented testimony by various experts with respect to the impact of the whole proposed project to the surrounding area and the traffic ramifications therefrom.
At hearing, Churchill presented testimony by James M. Sloan (Sloan), a Board recognized real estate expert who testified with respect to the impact of the proposed complex on the surrounding area.[2] (Tr. at 74.) Sloan stated that the subject area retains mixed property uses, including single family and multifamily dwellings, commercial uses, light industrial uses, and heavy industrial uses. (Tr. at 77-78.) Additionally, Sloan testified that he could not conceive that the proposed development would have any adverse impact upon the surrounding properties but that it would be a great enhancement to the subject area. (Tr. at 80.)
Churchill also presented testimony by Robert S. Brown (Brown), a Board recognized expert in traffic engineering. (Tr. at 97.) Brown testified that a complete traffic study, incorporating all of the proposed uses was performed during school hours to ascertain an estimated traffic volume for peak periods on the surrounding area. (Tr. at 97-100.) Brown also stated that part of the study encompassed the traffic signals and its impact on the nearby fire station. (Tr. at 102-03.) Brown indicated that a "fire pre-empt system" is recommended and has, in fact, been accepted by the Fire Department so that it may activate the traffic signals around it as fire trucks leave this particular station.
(Tr. at 103.) Brown indicated that one of the intersections affected by this proposal, George Bennett Highway and Cottage Street, would "at least" increase from a "B" level to a "C" level of service. (Tr. at 105.) Brown further testified that the increase in new traffic on the adjoining streets during peak weekday hours would be approximately 500 new trips and almost 800 new trips on weekends. (Tr. at 106-107.)
Additionally, Churchill called David Taglianetti (Taglianetti), a Board recognized expert in civil engineering, to testify in support of each application, which will be discussed in turn below. (Tr. at 4.)
 The Drive-thru Pharmacy
With respect to the drive-thru pharmacy application (CA. No. 00-5824), engineer Taglianetti stated that the zoning ordinance requires a minimum lot size of 10,000 square feet in order to accommodate a drive-thru window and that Churchill has over 66,000 square feet of land. (Tr. at 21.)
Taglianetti also stated that any on-site stacking line would satisfy the requirement that it be more than 50 feet from a residential zone and over 100 feet from a residential use. (Tr. at 22.) Churchill also called Joseph Penney (Penney), a real estate development manager, to testify with respect to the substance of the pharmacy drive-thru and the methodology for processing orders. (Tr. at 26.) Penney stated that approximately 50 customers per week would be anticipated to utilize the pharmacy drive-thru and that it is not open for 24 hours. (Tr. at 27, 30.)
 The Restaurant Drive-thru
With respect to the application for the fast food restaurant drive-thru (C.A. No. 00-5825),
Taglianetti testified that the proposal allows for in excess of ten vehicles that can drive to the restaurant without interfering with traffic circulation or parking. (Tr. at 32.) The Board questioned Taglianetti about the possibility of vehicles queuing up in the parking lot behind the intercom system while orders are being placed. (Tr. at 34.) Taglianetti responded that he would investigate the possibility of an isolated queuing line. (Tr. at 34.)
 The Gasoline Station
In discussing the application for the erection of a gasoline service station (C.A. No. 00-5826),
Taglianetti testified that the requirements of the ordinance are satisfied with a lot size of 20,000 square feet or greater, a lot depth of at least 100 feet, and a lot width and frontage of at least 100 feet. (Tr. at 57-58.) Furthermore, Taglianetti testified that the proposed gasoline service station satisfies the minimum setback requirements, the minimum distance between access driveways, the minimum distance between pump islands, the minimum distance between the canopy and street line, the minimum distance between the canopy and any interior lot line, and the compressed air connection requirements. (Tr. at 59-60.) Taglianetti also stated that the requirements were met for the maximum storage allowance and the minimum separation distance between underground tanks (Tr. at 60.) Additionally, Taglianetti clarified that the proposed gasoline station would not repair, store, or wash vehicles (Tr. at 60-61.)
Finally, Taglianetti testified with respect to the traffic impact of trucks fueling, the queuing plan for the facility, and the design and layout of the pumps (Tr. at 69-71.)
Also testifying for Churchill with respect to the gasoline service station was Board — recognized — expert — William Taber (Taber), a chemical engineer. (Tr. at 64.) Taber testified to the double pane wall design of the underground gas tanks, emergency procedures in place in the event of a fuel leak, and the feasibility of placing the gas tanks above ground, as opposed to underground, to eliminate the possibility of possible water contamination. (Tr. at 66-68.) Finally, the Board was concerned with the odor of gasoline when a tanker truck is supplying fuel. Taber testified that the system is designed so the gas vapor is retained in the truck (Tr. at 72-73.)
 The Multi-tenant Structure
In testifying with respect to the proposed multi-tenant structure (C.A. No. 00-5827), Taglianetti stated that the proposed retail area is approximately 12, 000 square feet and expects two or three retail uses to occupy that space. (Tr. at 35.)[3] However, at the date of hearing, no prospective tenants were signed to occupy said space. (Tr. at 44.)
 The Fast-food Restaurant
In discussing Churchill's application for the construction of a fast-food restaurant at the site (C.A. No. 00-5828), Taglianetti stated that the restaurant would have 3,600 square feet of gross floor area with approximately 60 seats. (Tr. at 5-6.) In addition, he stated that the fast-food restaurant would exceed the ordinance requirement of 15 parking spaces with approximately 39 parking spaces. (Tr. at 6-7.) Taglianetti also testified that the proposal exceeds the handicapped requirements of the Americans with Disabilities Act. (Tr. at 7.)
 The Sit-down Restaurant
With respect to Churchill's application for a sit-down restaurant (C.A. No. 00-5829),
Taglianetti testified that the proposed restaurant would have 5,000 square feet of gross floor area with approximately 200 seats (Tr. at 5-6.) He further stated that the restaurant would have approximately 134 parking spaces, in excess of the ordinance requirement of 50 parking spaces (Tr. at 6.)
Additionally, Taglianetti stated that the proposal exceeds the handicapped requirements of the Americans with Disabilities Act. (Tr. at 7.) When faced with questions by the Board as to whether a liquor license or entertainment license would be sought, Taglianetti stated that it was possible that a liquor license would be sought but not an entertainment license as Churchill anticipated a Pizzeria Uno, or Pub 99-type restaurant. (Tr. at 8-9.)
A number of remonstrants spoke against the project at the end of hearing. Those objecting to the applications were primarily concerned with a substantial increase in traffic and the safety of the school children who attend an elementary school located on Cottage Street, within 200 feet of the proposed complex. One of the intervenors, Julio Sequeira, Jr., (Sequeira) an area resident for more than fifty years, spoke against the restaurant applications and the project generally. (Tr. at 12-18.)
Sequeira opined that the project is inappropriate to the neighborhood because, among other reasons, Cottage Street is a two lane highway and inadequate to sustain projected increases in traffic flow. (Tr. at 14.) Sharon Coyle (Coyle), another area resident, voiced concern for the safety of the approximate eight hundred students who attend the elementary school and, in particular, the unaccompanied children who cross the streets to and from school everyday. (Tr. at 120-127.) Coyle further stated that the area is "a bad site, near the industrial highway, . . . and the trucks just fly through there." In response to Coyle's comment, Board member David R. Azevedo stated that "I saw a truck split in half down there . . . it was unbelievable." (Tr. at 127.)
On October 3, 2000, the Board voted on the six applications, with three members voting in favor of granting the applications and two members voting against. However, this vote constituted a denial of the applications, pursuant to G.L. § 45-24-57 (2) (iii) which requires a "concurring vote of four (4) of the five (5) members of the zoning board of review sitting at a hearing . . . to decide in favor of an applicant on any matter within the discretion of the board. . . , including variances and special-use permits." On November 6, 2000, the Board entered six written decisions denying each application.
On November 8, 2000, Churchill filed the instant appeals which were consolidated thereafter due to affinity of parties and the common development scheme by Churchill.
On January 11, 2001, this Court permitted "Theresa Landry and Community Against Stop Shop" to intervene in the subject appeal. Additionally, on February 19, 2001, the Court permitted Julio Sequeira, Jr., a business owner and resident from the area, to intervene in the subject appeal.
 Standard of Review
This Court possesses appellate review jurisdiction of a zoning board of review decision.
Pursuant to G.L. § 45-24-69(D):
 "(D) The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
(1) In violation of constitutional, statutory or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When reviewing the decision of a zoning board of review, this Court must examine the entire certified record to determine whether substantial evidence exists to support the findings of the zoning board of review. Salve Regina College v. Zoning Bd. of Review, 594 A.2d 878, 880 (R.I. 1991) (citing DeStefano v. Zoning Bd. of Review of Warwick, 122 R.I. 241, 245, 405 A.2d 1167, 1170 (1979)); see also Restivo v. Lynch, 707 A.2d 663
(R.I. 1998). "Substantial evidence as used in this context means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion and means an amount more that a scintilla but less than a preponderance." Caswell v. George Sherman Sand and Gravel Co., Inc., 424 A.2d 646, 647 (R.I. 1981) (citing Apostolou v. Genovesi,120 R.I. 501, 507, 388 A.2d 821, 825 (1978)). The essential function of the zoning board of review is to weigh evidence with discretion to accept or reject the evidence presented. Bellevue Shopping Center Associates v. Chase, 574 A.2d 760, 764 (R.I. 1990). Moreover, this Court should exercise restraint in substituting its judgment for the zoning board of review and is compelled to uphold the board's decision if the court "conscientiously finds" that the decision is supported by substantial evidence contained in the record. Mendonsa v. Corey, 495 A.2d 257 (R.I. 1985) (quoting Apostolou v. Genovesi, 120 R.I. 501, 507, 388 A.2d 821, 825 (1978)).
 Special Use Permit
The purpose of the special use permit is to establish "conditionally permitted" uses within the ordinance. Westminster Corp. v. Zoning Bd. of Review, 238 A.2d 353 (R.I. 1968). A special use permit may be granted by a zoning ordinance when the ordinance specifies the particular use authorized by special use permit, describes the conditions and procedures for the special use categories, establishes criteria for special use permits that conform to the ordinance and complies with the constitutional due process requirements. G.L. 1956 § 45-24-42. A special-use permit will be granted where it is shown that neither the proposed use nor its location on the site will result in conditions that will be detrimental to the public health, safety, morals and welfare. Toohey v. Kilday, 415 A.2d 732, 736 (R.I. 1980); Hester v. Timothy,275 A.2d 637, 641-42 (1971).
According to § 410-113 (B) of the Pawtucket Zoning Ordinance, the following standards must be entered into the record of the proceedings in order to grant a special use permit:
 "(1) That the special use is specifically authorized by this chapter, and setting forth the exact subsection of this chapter containing the jurisdictional authorization;
 (2) That the special use meets all of the criteria set forth in the subsection of this chapter authorizing such special use.
 (3) That the granting of the special use permit will not alter the general character of the surrounding area or impair the intent or purpose of this chapter or the Comprehensive Plan of the city."
 The Board's Decisions
In its six separate decisions, based on evidence offered by Churchill, testimony at the hearing, and the Board's own inspection of the subject parcel, the Board found that Churchill failed to offer sufficient probative evidence that "the proposed use will not danger the neighboring community in any manner" and further, that "the proposed use and its location on the site will [not] have a detrimental effect upon the public health, safety, morals, and welfare of the surrounding area." (Board Decisions 00-58 — 00-63.) In each of its decisions, the two dissenting members of the Board made the following finding:
 "Specifically, two members of the Board, using their expert knowledge in the field of zoning, find that a substantial increase in the flow and congestion of traffic in the area of Cottage Street, which will be caused by the proposed use, is not acceptable, and will ultimately have a detrimental effect upon the public health, safety, morals, and welfare of the surrounding area."
(Board Decisions 00-58 — 00-63.) Additionally, with respect to the application for the gasoline station, the dissenting Board members "were concerned that the underground gasoline tanks could create a safety hazard and contaminate existing underground water." (Board Decision 00-58 — 00-63.)
 Appellate Argument
Churchill maintains that all conditions and requirements were satisfied in the applications for special use permits and that the denial of said permits was an abuse of discretion by the Board. At hearing, Churchill presented expert testimony detailing the manner in which each of the special use permit applications satisfies the specific requirements of the Pawtucket Zoning Ordinance and the implications of the project on the surrounding area. Churchill submits that neither the City nor the intervenors submitted any competent opposing evidence that warranted a denial of these applications.
The Board asserts that its decision should be affirmed due to a "substantial increase in the flow and congestion of traffic in the area . . . which will be caused by the proposed use, . . . and [that it] will ultimately have a detrimental effect on the public health, safety, morals and welfare of the surrounding area." The Board submits that prior to the hearing, all of the Board members made an inspection of the subject property and the surrounding properties in the neighborhood. Additionally, the Board cites Smith v. Zoning Board of Review of the City of Warwick, 237 A.2d 551 (R.I. 1968) for the proposition that board members may make their findings and reach their decision "in reliance upon [their] own knowledge of traffic conditions and highway patterns in the vicinity of petitioners' premises."
Finally, the Board relies upon Schofield v. Zoning Board of Review of the City of Cranston, 99 R.I. 204, 206 A.2d 524 (1965) for the principal that a minority of zoning board members may use their zoning expertise and information gathered from a site visit to make findings contrary to the majority's.
The intervenors, Theresa Landry and Community Against Stop Shop, assert that there is more than substantial evidence to support the zoning board's denial of Churchill's six special use applications. They argue that if these special use permits are granted, the site would be severely over-intensified, thereby altering the character of the predominantly residential area, and that traffic congestion would pose a safety hazard to the schoolchildren at the nearby elementary school.
The intervenor, Julio Sequeira, Jr., submits that granting these special use permits would contradict the goals of the City's Comprehensive Plan. Additionally, Sequeira maintains that Churchill failed to address traffic safety concerns, especially with respect to the fast-food restaurant application and the gas station application.
 The Special Use Permits
Our Supreme Court has consistently maintained that the purpose of the special use permit is to establish within the ordinance conditionally permitted uses. Nani v. Zoning Board of Review, 104 R.I. 150, 242 A.2d 403
(1968); Westminster Corp. v. Zoning Board of Review, 103 R.I. 381,238 A.2d 353 (1968) (emphasis added). In order to satisfy the conditions, however, the petitioner must show that neither the proposed use nor its location on the premises would have a detrimental effect upon public health, safety and general welfare. Toohey v. Kilday, 415 A.2d 732
(R.I. 1980).
Churchill maintains that all conditions and requirements were satisfied in its applications and competent evidence was submitted showing that the proposed uses would not have a detrimental effect upon the public. However, the two dissenting members of the Board ultimately concluded that granting the six special use permits would result in "a substantial increase in the flow and congestion of traffic in the area of Cottage Street, . . . is not acceptable, and will ultimately have a detrimental effect upon the public health, safety, morals, and welfare of the surrounding area." (Board Decisions 00-58 — 00-63.)
Furthermore, the Board concluded that Churchill did not meet its burden that "the proposed use will not danger the neighboring community in any manner." (Board Decisions 00-58 — 00-63.) In fact, the record reveals a serious concern for traffic congestion and the effect such increased traffic flow would have on the surrounding area, particularly, the safety of the children attending the school located on Cottage Street. (Tr. at 125-128, 130-131, 133-135.)
Churchill further asserts that the Board failed to offer any competent evidence negating the findings of its experts to warrant the denial of the applications. Our Supreme Court has concluded that even unopposed expert testimony may fall of its own weight if it is outweighed by evidence within the board's own knowledge. Smith v. Zoning Bd. Of Review of Warwick, 103 R.I. 328, 237 A.2d 551 (1968). In its decisions, the two dissenting Board members reached their outcome "using their expert knowledge in the field of zoning." The Rhode Island Supreme Court has stated that:
 "It is the well-settled law in this state that a zoning board of review is presumed to have knowledge concerning those matters which are related to an effective administration of the zoning ordinance. Where it appears from the record that a decision was reached in reliance upon such knowledge, it is considered by this court to constitute legal evidence sufficient to support such a finding."
Smith v. Zoning Board of Review of the City of Warwick, 103 R.I at 335, 237 A.2d at 555 (quoting
Monforte v. Zoning Board of Review, 93 R.I. 447, 449, 176 A.2d 726, 727-728 (1962)) (emphasis added). In the record of the hearing before the Board, one of the dissenting Board members, David R.
Azevedo, states his familiarity with the traffic patterns in the area and states that "I have been in this area when the school lets out, without [the proposed complex] there, it's a problem." (Tr. at 108).
Azevedo also states on the record that he witnessed an accident in the area where a truck was split in half. (Tr. at 127.) In addition to the Board's own knowledge, our Supreme Court has determined that members of [the Board] may draw inferences from factual lay testimony based, in part, on their own expertise, particularly when there is persuasive lay testimony describing physical facts and conditions of the subject or issues in question. Restivo v. Lynch, 707 A.2d 663, 671 (R.I. 1998). Various lay persons recounted the dangerous traffic conditions of the surrounding area based upon their own observations as residents of the area for a number of years. (Tr. at 125-128, 130-131, 133-135.)
Therefore, the Board's own knowledge and that acquired during a visit to the site, combined with these inferences drawn from the lay testimony of the various remonstrants, constitutes legally competent evidence sufficient to support its denial of the six special use permit applications. See Restivo v. Lynch, 707 A.2d at 671 (R.I. 1998); Smith v. Zoning Board of Review of the City of Warwick, 103 R.I at 335, 237 A.2d at 555.
Additionally, relying on Roger Williams College v. Gallison, 572 A.2d 61
(R.I. 1990), Churchill asserts that the proper remedy in the instant matter is to reverse the Board's decision and issue the six special use permits. Similar to the remonstrants in Gallison, Churchill submits that the remonstrants here failed to offer competent expert evidence detailing the proported traffic congestion that would occur if the permits were granted. The Superior Court in Gallison remanded the case to the Board for further evidentiary hearings on traffic studies. Id. at 62. Thereafter, our Supreme Court quashed the remand to the Board and entered a judgment reversing the decision of the Board, endorsing the following rationale:
 "The failure of the remonstrants to present persuasive and competent evidence on these issues was certainly not the fault of the petitioner. Therefore, we are of the opinion that it is inappropriate to require the petitioner to go through what in effect would be a de novo hearing in order that the remonstrants might present evidence that should have been available to them in the first instance."
Id. at 62.
The trial justice in Gallison concluded that "the record did not substantiate the decision of the Zoning Board denying the application for special exception" and thus the Court remanded the case to the Board in order to "take further evidence in respect to `traffic studies' and to address whether the proposed use would be compatible with neighboring land use." Id. at 62.
However, Churchill's reliance on Gallison is misplaced. Here the Court does not find a genuine defect in the proceedings, nor does it find that the Board failed to disclose in a reasonable manner the reasons or grounds for its decision. See Travers v. Zoning Board of Review,101 R.I. 510, 225 A.2d 222 (1967). In fact, the Court finds that through its decisions and the hearing record, the Board did disclose that the two minority members used their expert knowledge to find that a substantial increase in the flow and congestion of traffic will pose a risk to the public, particularly in the area of Cottage Street, where the school is located.
After a review of the entire record, this Court finds that the Board's decision to deny Plaintiff's applications for six special use permits was not clearly erroneous. The decision is not arbitrary, capricious, characterized by error of law or an abuse of discretion. Substantial rights of the petitioner have not been prejudiced. Accordingly, the decision of the Board is hereby affirmed.
Counsel shall submit the appropriate orders for entry.
[1] Plaintiff details in its memorandum that the Pawtucket City Council changed the zoning classification upon its application in anticipation of this project. On June 23, 2000, the Pawtucket City Planning Commission recommended to the City Council that these zoning changes be approved "because the land is underutilized and would be financially and aesthetically improved with the change to Commercial CG as described in the developer's presentation." On July 5, 2000, the City Council voted to approve the zone change.
[2] Sloan also gave his opinion in reference to the dimensional variance requests for signage at the proposed site. (Tr. at 82.) Ultimately, Churchill withdrew all dimensional variance applications. (Tr. 10/3/00 at 2.)
[3] Churchill sought but later withdrew its application for a dimensional variance for a freestanding sign for the multi-tenant structure. (Tr at 40.)