DECISION
Before the Court is an appeal from the Town of Portsmouth Zoning Board of Review's (Board) decision failing to approve Brooks Pharmacy's (appellant) request for a special use permit for the construction of a pharmaceutical retail store on East Main Street in Portsmouth. Jurisdiction is pursuant to G.L. 1956 § 45-24-69.
 Facts and Travel
The appellant filed an application for a special use permit with the Board requesting permission for the construction of a pharmacy it intended to build on property located on East Main Road in Portsmouth. The property is further identified as Tax Assessor's Plat 33, Lot 37 and Plat 35, Lots 22-25. The site is located in Portsmouth's Commercial District. At public hearings held on March 20, April 17, May 16, and May 31, 2001, the Board heard testimony from numerous experts presented by the appellant.
The Board also heard the testimony of the town's engineer and of a privately retained traffic engineer. Specifically, appellant sought a special use permit pursuant to Article V, Sec. A(1)(b)(e) (j) and Article VII, Sec. G of the Portsmouth Zoning Ordinance to establish the new retail use. Appellant also sought a modification to development standards set forth in Article VII, Sec. G(10)(o) governing distances between entrances and exits, a special use permit pursuant to Article V, (I)(13) to allow a drive-through and a special use permit pursuant to Article IX, (B)(6) to allow signs exceeding the maximum area and number.
Relevant to the present appeal, at the hearing, the Board accepted reports and testimony from three traffic consultants; James Cronan of Crossman Engineering, retained by appellants; Stephen Garofalo of Garofalo and Associates; and Stephen Savaria of Fuss and O'Neil, retained by the town. Mr. Cronan, accepted as a traffic engineer expert, testified that he performed a traffic count survey on East Main Road during what would be peak hours of the appellant's business. He testified regarding the design of the proposed store and use of the two proposed entrances and exit.
In relation to the store's northerly entrance-only curb-cut, Mr. Cronan testified that he did not see any problems with the cars "stacking" and backing out into East Main Road. In fact, he stated, "it's not something where the guy will be stopping out there. He will slow down to a point and come into the site. It won't be lingering." (Tr. at 114).
With regard to vehicles exiting the store's premises, Mr. Cronan testified that cars would have to wait for a gap, but they would be sitting on Brooks' property, not impacting East Main Road while waiting. (Tr. at 126). Mr. Cronan also testified that he believed that vehicles entering the site would not cause many accidents. He stated, "I don't anticipate many, if any, accidents happening there, and at the intersection, itself." (Tr. at 129). When Mr. Cronan was asked what he based that opinion on, he stated, "Just experience." (Tr. at 129). Ultimately, Mr. Cronan concluded, "the proposed Brooks Pharmacy would not be harmful to the safety and welfare of the motoring public." This is based on the fact that there would be no degradation of the level of service at the intersection. This type of retail use tends to attract customers from the existing traffic stream, and also, there is sufficient sight distance at the proposed access driveway." (Tr. at 130-131).
A traffic study prepared by Mr. Cronan for the appellant was submitted as a full exhibit. Mr. Cronan was questioned extensively by the lawyers and Board members about the traffic considerations for entering and exiting the parking lot. Of particular concern to the members were existing numbers of accidents already recorded in the subject intersection. (Tr. at 133, 149). When questioned by one Board member about accidents, the following exchange occurred:
 Mr. Nott: "East Main Road at Clement's Market, the old driveway.[1] 1998 it shows as having seven accidents there, 1999 there were 11 there, and everywhere else was two, three. 2000 there were actually eight accidents there, not 14, but again, that's more than everywhere else.
 Mr. Cronan: Right. What I am saying is it's basically equivalent to the intersection.
 Mr. Nott: Right. So do you agree that's probably the worst area down there for accidents where the old Clements entrance was?
 Mr. Cronan: If I don't include the intersection, yes. . . .
 Mr. Nott: That is correct, okay. Can you just tell me what is going to be different considering that the Brooks proposal is almost right across the street from that old entrance; and in my opinion . . . we are pushing this up closer to the stop light, . . . we may potentially bring the problem back again.
 Mr. Cronan: The main thing is volume. I am not sure just what the volume is, but grocery stores can range anywhere from four to six trips per hour. We are looking at 140 trips." (Tr. at 133-134) (emphasis added).
The Board also accepted Stephen B. Garofalo, an engineer, as an expert in traffic matters. Mr. Garofalo testified that he performed a traffic analysis report regarding the proposed Brooks Pharmacy. He testified regarding the design and use of the proposed Brooks Pharmacy. Mr. Garofalo also testified that he believed that the entrance-only portion of the site, on East Main Road, would cause a hazardous traffic situation. In fact, he stated, "When we viewed the site plan and the northerly entrance, what became noticeable was the fact that there is a very short throat length . . . only approximately 30 feet." (Tr. at 15).
Mr. Garofalo further stated that this would cause "stacking" or the incident of vehicles "hanging out" onto East Main Road when attempting to enter the site. Id. Such a situation was considered to be hazardous by Mr. Garofalo. (Tr. at 24).
In addition to Mr. Garofalo's concerns about "stacking," he also considered what he referred to as "crossing movements" to be a hazard. (Tr. at 23-24). Essentially, this consists of vehicles leaving Clement's Market and cutting across the intersection, thereby coming into the subject site at the northerly access. Id. The traffic analysis prepared by Mr. Garofalo was submitted as a full exhibit, the conclusion of which was "that based upon the analyses presented within this report, coupled with field observations, it is the opinion that the northerly access to the proposed pharmacy has the potential to cause safety problems in the traffic sensitive areas of East Main Road and Turnpike Avenue."
Mr. Garofalo was questioned by counsel for the appellant and by the Board members. Of great focus during the questioning was the potential for reducing safety hazards by placing signs at the site and the elimination of the "crossing maneuver" by adding an additional phase to the light signal. (Tr. at 42). However, despite a discussion of these possible alternatives, Mr. Garofalo remained steadfast in his position that the site has a "potential for a safety problem." (Tr. at 45).
The Board next acknowledged the town's retained traffic expert, Stephen Savaria, a senior traffic engineer at Fuss O'Neill. He testified that the northerly entrance-only curb cut would not cause a safety hazard. (Tr. at 55). Mr. Savaria was questioned and spoke at great length about the "stacking" problem which might occur if cars backed up at the northerly entrance-only curb cut. He could not envision how a "stacking" hazard would occur at that location. (Tr. at 59). His response to this problem was, "the likelihood that anybody is going to have to stop as they come in that intersection is pretty small." (Tr. at 59). On the other hand, Mr. Savaria did concede that based upon an accident analysis of the site, the subject intersection was on the high accident list or "high hazard list." (Tr. at 52).
In regard to the southerly entrance and exit curb cut, Mr. Savaria stated that "it looks as though they got about (20%) more demand than are available gaps [in the traffic flow] . . . Whether that presents a safety problem or not, I guess, becomes a matter of judgment and opinion. . . ." (Tr. at 48).
The Board denied the petition for a special use permit by a vote of three to two (3-2), and on June 26, 2001, the Board's written decision was recorded and posted in Portsmouth Town Hall. The Board based its decision upon its determination that "the project did not provide safe vehicular access in the area of a busy intersection and would thus constitute a hazard." (Decision at 6). On appeal, the appellant argues that the Board erred as a matter of law in failing to apply the zoning standards for traffic analysis. Alternatively, appellant argues that the record does not contain compelling evidence that the project would create a safety hazard.
 Standard of Review
This Court's appellate jurisdiction of zoning board of review decisions is pursuant to G.L. 1956 § 45-24-69(D), which states:
 "(D) The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 i. In violation of constitutional, statutory or ordinance provisions;
 ii. In excess of the authority granted to the zoning board of review by statute or ordinance;
 iii. Made upon unlawful procedure;
 iv. Affected by other error of law;
 v. Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 vi. Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When reviewing the decision of the Board, this Court must examine the entire certified record to determine whether substantial evidence exists to support its findings. Salve Regina College v. Zoning Board of Review,594 A.2d 878, 880 (R.I. 1991) (citing DeStefano v. Zoning Board of Review of Warwick, 122 R.I. 241, 245, 405 A.2d 1167, 1170 (1979)); see also Restivo v. Lynch, 707 A.2d 663 (R.I. 1998). "Substantial evidence as used in this context means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion and means an amount more than a preponderance." Caswell v. George Sherman Sand and Gravel Co., Inc.,424 A.2d 646, 647 (R.I. 1981) (citing Apostolou v. Genovesi, 120 R.I. 501, 507, 388 A.2d 821, 825 (1978)). The essential function of the zoning board of review is to weigh evidence with discretion to accept or reject the evidence presented. Bellevue Shopping Center Associates v. Chase,574 A.2d 760, 764 (R.I. 1990).
Moreover, this Court should exercise restraint in submitting its judgment for the Board and is compelled to uphold the Board's decision if the Court "conscientiously finds" that the decision is supported by substantial evidence contained in the record. Mendonsa v. Corey,495 A.2d 257 (R.I. 1985) (quoting Apostolou v. Genovesi, 120 R.I. 501, 507, 388 A.2d 821, 825 (1978)).
 Special Use Permits
The subject site is located in Portsmouth's Commercial District, which permits retail businesses. However, as a new retail business, over (5000) square feet, a special use permit is required. Portsmouth Zoning Ordinance Art. V(E)(14). Additionally, special use permits are required for a drive-through facility, signage, and more than one driveway. Portsmouth Zoning Ordinance, supra. Relevant to the present appeal, the standards for special use permit approval require that
 "(a) the desired use will not be detrimental to the surrounding area.
 (b) it will be compatible with neighboring land uses.
 (c) it will not create a nuisance or a hazard in the neighborhood. . . .
 (e) safe vehicular access and adequate parking are provided. . . .
 (h) the proposed special use will be in conformance with the purposes and intent of the comprehensive plan and the zoning ordinance of the Town of Portsmouth, and
 (i) the health, safety and welfare of the community is protected." Portsmouth Zoning Ordinance Art. VII (A)(4).
The appellant argues that the Board improperly applied the correct standard for traffic analyses. Specifically, appellant cites the case of Toohey v. Kilday, 415 A.2d 732 (R.I. 1980), in support of the proposition that in order for the Board to reject an application on traffic related issues, it must first find an increase in traffic, and then that the increase will result in a safety hazard. The Boards responds that they properly applied the standards for traffic analyses by finding only that the proposed use would create a traffic safety hazard.
The Rhode Island Supreme Court has held that while traffic congestion is germane as to whether or not a proposed use would adversely affect the public convenience and welfare, the evidence must relate to whether the traffic generated by the proposed use will intensify the congestion or create a hazard. Bonitati Bros. v. Zoning Board of Woonsocket,104 R.I. 170, 171, 242 A.2d 692, 693 (1968). Moreover, an increase in traffic, even if it did occur, does not necessarily adversely affect the public convenience and welfare. A mere increase in traffic at the site of a proposed use is not a valid zoning criterion when neither a consequent intensification of traffic congestion nor hazard at the location accompanies it. Toohey v. Kilday, 415 A.2d 732, 737 (R.I. 1980).
Contrary to the position of the appellant, there is nothing evident from the aforementioned case law which indicates a dual inquiry test in relation to traffic analyses. Rather, it is clear that while an increase in traffic may be germane to the public welfare, it certainly is not a prerequisite to finding that a certain traffic circumstance constitutes a hazard. Therefore, appellant's reliance on Supreme Court case law in support of a two-part test for traffic analyses is misplaced.
The appellant next argues that the Board made its decision based on a record devoid of compelling evidence that the project would create a traffic hazard. The Board responds that they adequately stated their reasons for determining that the proposed project constituted a hazard.
In the present case, the Board rendered a formal decision, and it is clear from a review of the certified record that the Board members did state the factors within their knowledge which they relied upon in concluding that traffic at this site would cause a traffic hazard. For example, Stephen Garofalo, a traffic expert, testified that the northerly entrance had a short throat, which could lead to the stacking of cars and their eventual exposure to oncoming traffic. (Decision at 4); (Tr. at 24). Furthermore, it was his opinion that the northerly entrance was too wide, which would persuade some motorists to utilize it as an exit. Id; (Tr. at 21).
In conclusion, Mr. Garofalo reaffirmed his reported opinion that the proposal had potential to cause a safety problem. Id. Therefore, "the Board determined that the project did not provide safe vehicular access in the area of a busy intersection and would constitute a hazard." Id. at 6. Based on the foregoing, this Court finds that the Board did not merely state conclusions, but that they listed the facts on which they based their conclusion that the proposed use would comprise a hazard. See Toohey, 415 A.2d at 737. (Contrastingly, the Court in Toohey found that the Board's statement it was "well familiar with the area in question and knows of its character" was conclusory and an insufficient basis to deny a special use permit.).
In addition, while certain experts did expound opinions which were in conflict with those of Mr. Garofalo and his report, there is nothing in the record before this Court to indicate that the Board erroneously relied on Mr. Garofalo's testimony in rendering its opinion. While Mr. Cronan and Mr. Savaria were also qualified as experts on parking, the Board was not obliged to accept their testimony because there was evidence of record that controverted those expert opinions. See Restivo v. Lynch, 707 A.2d 663 (R.I. 1998).
As this Court cannot substitute its opinion for that of the Board on the weight of the evidence, this Court finds that after the Board's hearing the testimony of both Mr. Cronan and Mr. Savaria, its concluding to the contrary resulted "from an exercise of the Board's fact-finding power on legally competent evidence." Braun v. Zoning Board of Review of South Kingston, 99 R.I. 105, 206 A.2d 96 (1965).
 Conclusion
After a review of the entire record, this Court finds that the Board's decision to deny a special use permit is supported by the reliable, probative, and substantial evidence and was not arbitrary or capricious or affected by error of law. The Court further finds that substantial rights of the appellant have not been prejudiced. Counsel shall submit an appropriate order after notice.
[1] Clement's Market is a grocery store.