DECISION
This matter is before the Court on RBSE Properties, LLC's ("RBSE") appeal from the May 3, 2005 decision of the Zoning Board of Review of the Town of Lincoln ("Board"), denying RBSE's application for a Special Use Permit to construct a six-unit condominium. Jurisdiction is pursuant to G.L. 1956 § 45-24-69. For the reasons set forth below, the Board's decision is reversed.
 Facts and Travel
RBSE is the owner of a piece of property ("Property") located at 74-76 Ash Street, Lincoln, Rhode Island, identified as Lot number 28, Plat 6. The Property lies in an RG-7 zoning district, which allows multifamily dwellings as a specially permitted use. Currently situated upon the property are two buildings consisting of five dwelling units, permitted as a prior nonconforming use. (Tr. at 5.) On March 22, 2005, RBSE filed an application with the Board for a Special Use Permit to demolish the existing structures and construct in their place a single condominium structure, containing six, two-bedroom units. RBSE's application was reviewed by the Town's Planning Board's Technical Review Committee ("TRC") and the Town's Planning Board, both of which recommended approval of the application. On May 3, 2005, the Board held a public hearing to receive comments on and rule upon RBSE's application.
At the beginning of the hearing, RBSE informed the Board that although the existing structure does not meet the setback requirements of the current zoning ordinance, its proposed building would satisfy those requirements and would conform in such regards. (Tr. at 7.) RBSE then presented four expert witnesses in support of its application. Its first witness, Edward Pimentel, was accepted by the Board as an expert in land planning. (Tr. at 8.) Pimentel testified that there were other multifamily units in the neighborhood and that in his opinion, the development "meets the goals and objectives of the Comprehensive Plan." (Tr. at 14, 16.) RBSE then examined James Salem, a recognized traffic expert. (Tr. at 16.) According to Salem, the proposed units would increase the traffic in the neighborhood by only approximately seven additional trips per day. (Tr. at 19.) Furthermore, after several analyses, Salem concluded that the area would maintain "the level of service A which is little or no delay" (Tr. at 21) and that the "proposed use will not cause congestion nor would it create a hazard." (Tr. at 22.) Salem also opined that the proposed parking plan would "improve the circulation on the site" and that the "circulation on the site [would] be much better than what exists today." (Tr. at 22.)
RBSE next offered the testimony of Robert DeGregorio, an expert in real estate.[1] (Tr. at 31-32.) DeGregorio avowed that there are other multifamily residences in the area (Tr. at 33), that the proposal would be "esthetically better [sic] [and] from a parking perspective better," (Tr. at 34) and that he could not see how the proposed units would have any impact on the neighborhood other than a positive impact in value. Id.
Finally, RBSE concluded its case by introducing Christopher Bleyer, a residential designer who drew the plans for the units. (Tr. at 36.) Bleyer acknowledged that while the existing buildings were painted the same color, the proposed six units would be painted different colors, although the shingles and shutters would be the same color to provide some uniformity amongst the units. (Tr. 38-39.)
After RBSE had presented its last witness, the Board opened the meeting for public comment. (Tr. at 41.) At this point, a number of neighboring residents spoke out in opposition to RBSE's application. Primarily, the neighbors were concerned that the proposed units would increase the existing traffic and parking problems. For example, one neighbor, Mrs. Camara, testified that "I walk the street and I see that there's no parking on either side because it's already congested." (Tr. at 43.) Another neighbor, Mr. Lackasy stated that "Nobody is going to use the garages because people don't use the garages as it is now. They park on the street. . . . People park on my side of the street which it's supposed to be illegal to park." (Tr. at 47-48.) In addition, local resident Mrs. Erickson declared: "There's parking on both sides of the street all the time. . . . The traffic and the parking is absolutely ridiculous. In front of my house between me and my neighbor on the pole is a no parking sign. Well, they park right under it." (Tr. at 61.) Furthermore, several opponents testified about the problems that were caused by the individuals currently living on the property. One objector commented that the current occupants played their music excessively loud. (Tr. at 51.) Another neighbor complained that the residents treat their property as a junk yard and race their cars up and down the street. (Tr. at 68-69.)
The Board then discussed their individual views of the proposal.[2] Board member Russo found that RBSE "certainly demonstrated the special use permit meets all the criteria for the zoning ordinance, such as parking, lighting, and use regulations." (Tr. at 88.) However, he thereafter made a motion to deny the application on the following grounds:
 "I did not find that this project meets — I did find that it would alter the general characteristic of the neighborhood by my opinion doubling the intensification. I feel that the special use permit if granted would effect [sic] the health and safety of the neighborhood by intensifying the traffic." (Tr. at 88.)
Russo's motion to deny the application was seconded by Board member Gobeille and was passed by the Board's unanimous 5-0 vote. RBSE filed a timely appeal to this Court for review.
 Standard of Review
The Superior Court's review of a zoning board's decision is governed by § 45-246-9 (D), which provides:
 "The Court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 (1) In violation of constitutional, statutory or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
"The Superior Court reviews the decisions of a plan commission or board of review under the `traditional judicial review' standard applicable to administrative agency actions." Restivo v. Lynch,707 A.2d 663, 665 (R.I. 1998). When reviewing a zoning board decision, the Superior Court "lacks [the] authority to weigh the evidence, to pass upon the credibility of witnesses, or to substitute his or her findings of fact for those made at the administrative level." Id. at 665-66 (quoting Lett v.Caromile, 510 A.2d 958, 960 (R.I. 1986)). The Court must examine the entire record to determine whether substantial evidence exists to support the board's decision. Salve Regina College v.Zoning Bd. of Review, 594 A.2d 878, 880 (R.I. 1991). "`Substantial evidence . . . means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion and means an amount more than a scintilla, but less than a preponderance.'" Lischio v. Zoning Bd. of Review, 818 A.2d 685,690 n. 5 (R.I. 2003) (quoting Caswell v. George Sherman Sand andGravel Co., Inc., 424 A.2d 646, 647 (R.I. 1981)). If the zoning board's decision is affected with legal error, though, the Court must reverse said decision. Harmel Corp. v. Zoning Bd. ofReview, 603 A.2d 303, 305 (R.I. 1992).
 Analysis
Special Use Permits
Rhode Island General Law 1956 § 45-24-42 provides municipalities with the authority to issue special use permits. That Section states in part that "A zoning ordinance shall provide for the issuance of special-use permits approved by the zoning board of review." Pursuant to this authority, the Town of Lincoln has adopted Zoning Ordinances § 260-66 and 260-67, which allow the zoning board to approve applications for special use permits, provided certain conditions have been established. In particular, § 260-67 requires the following:
 "In granting a special use permit, the Zoning Board of Review shall require evidence to the satisfaction of the following standards to be entered into the record of the proceedings that:
 A. The special use is specifically authorized by this chapter, and setting forth the exact subsection of this chapter containing the jurisdictional authorization;
 B. The special use meets all the criteria set forth in this chapter authorizing such special use;
 C. The granting of the special use permit will not alter the general character of the surrounding area; and
 D. The granting of the special use permit will not impair the intent or purpose of this chapter, nor the Comprehensive Plan."
Further, the Supreme Court of Rhode Island has held that "the zoning board must decide whether granting the special-use permit conforms with the requirements of § 45-24-42." Lischio,818 A.2d at 693.
Here, the record reveals that the Board denied RBSE's application on two grounds. The Board first found that RBSE's proposal would "alter the general characteristic of the neighborhood by . . . doubling the intensification [of the present use]." (Tr. at 88.) Second, the Board found that the proposal, if granted, "would effect [sic] the health and safety of the neighborhood by intensifying the traffic." Id. RBSE contends that both of these findings are erroneous, based on insubstantial evidence, and cannot support the Board's decision.
Intensification of Use and the Character of the SurroundingArea
RBSE's first argument on appeal is that there is no substantial evidence in the record to support a finding that the proposed special use would impermissibly alter the general character of the surrounding area. According to RBSE, because the Town of Lincoln Zoning Ordinance ("Zoning Ordinance") allows for multifamily dwellings by special permit, such a use is presumptively harmonious with the neighborhood's character. Furthermore, RBSE asserts that the proposed use would not double the intensification of the existing use as the number of dwelling units would only increase from five to six. While the number of bedrooms would increase from five to twelve, RBSE contends that the Board cannot rely on this additional number of bedrooms as a basis for finding that the character of the surrounding area would change. Consequently, RBSE believes that the Board was without substantial evidence when it found that an increase in the amount of bedrooms would impermissibly alter the character of the surrounding area.
The Supreme Court of Rhode Island has held that a special use permit cannot be denied on the ground that a certain condition would arise, when that condition could equally occur with a permitted use. Center Realty Corp. v. Zoning Bd. of Review,96 R.I. 482, 486, 194 A.2d 671, 673 (1963). In Center RealtyCorp., a property owner sought a special exception (special use permit) to construct a gasoline station but was denied such relief by the zoning board because the station would cause an increase in left turns out of the property, consequently creating hazardous traffic conditions. Id. at 484, 194 A.2d at 672. The traffic expert, whom the board relied upon in making its conclusion, further testified however, that "a similar increase in the number of such left turns would accompany the operation of any other permitted use on petitioner's parcel." Id. On appeal, the Court found that the testimony on the increase in traffic and left turns was without probative force because those same conditions would occur with any permitted use of the property, not just with the specially permitted use. The Court reasoned:
 "We are unable, after serious consideration, to conclude that this evidence has probative force on the pertinent issue here because it relates to the effect of a permitted use upon the convenience and welfare of the public. It tends to establish, in our opinion, that the conduct of a use permitted on the parcel in question under the terms of the ordinance would generate a need for making left-hand turns in traffic and results in an increase in traffic hazards. This then would establish only that a granting of the exception sought would result in a condition that was within the contemplation of the city council when it provided for the permitted uses that could be conducted on the parcel under consideration, a condition that cannot be viewed reasonably as adversely affecting the convenience and welfare of the public when it results from the granting of an exception set out in the ordinance." Id. at 486, 194 A.2d at 673.
In other words, because the increase in traffic was a consequence that could occur with any permitted use of the property, such an occurrence is not probative evidence which a zoning board can use to deny a specially permitted use of the property.
The Zoning Ordinance regulates residential uses, in part, based on the number of dwelling units on a piece of property, not on the number of bedrooms. See Town of Lincoln Zoning Ordinance, § 260-12. A "dwelling unit" is defined as "A structure or portion thereof providing complete, independent living facilities for one or more persons, including permanent provisions for living, sleeping, eating, cooking, and sanitation, and containing a separate means of ingress and egress." Id. at § 260-2. It follows, therefore, that the number of bedrooms in a residential dwelling unit is not regulated by the Zoning Ordinance. Thus, within a single family "dwelling unit," an owner could construct an unlimited number of bedrooms, so long as the number of dwelling units did not increase. RBSE's property lies within a RG-7 zone, an area zoned for single family housing. Accordingly, the twelve bedrooms included in RBSE's proposed six unit condominium could permissibly exist under the Zoning Ordinance without the need for a special use permit were they to be placed in a single family residence as opposed to several dwelling units. In accordance with the Court's reasoning in Center RealtyCorp., the Board cannot deny RBSE's special use permit simply because the number of bedrooms would increase when the Zoning Ordinance regulates dwelling units and not the number of bedrooms, and the number of bedrooms is a currently permitted use. As the Board found that RBSE's proposal would "alter the general characteristic of the neighborhood by . . . doubling the intensification," the Board consequently was in error for considering the number of bedrooms as a justification for denying RBSE's application.
The Supreme Court of Rhode Island has further held that when a use is specially permitted by the zoning ordinance, the legislature has implicitly held that the use "(1) is harmonious with the other uses permitted in that district, and (2) is not to be excluded unless the standards for a special exception are not satisfied with respect to its establishment at a particular location or site." Perron v. Zoning Board of Review,117 R.I. 571, 574, 369 A.2d 638, 640-41 (1977). Here, it is uncontested that multifamily housing is contemplated in the Zoning Ordinance as a specially permitted use. Thus, multifamily housing is presumptively harmonious with the character of the surrounding area. Upon review of the entire record, this Court finds that the Board was without substantial evidence to overcome this presumption that the proposed use was in conformity with the character of the neighborhood.
There is found in the record abundant evidence which demonstrates that RBSE's proposed six unit condominium would not impermissibly alter the character of the property in its immediate vicinity. For example, real estate expert Robert DeGregorio testified that the neighborhood is a mixed area composed of both single-family and multi-family residences and that the proposed condominium would not "detract from the area." (Tr. at 33, 35.) Edward Pimentel, a recognized land expert, also articulated that
 "the granting of the special use permit will not alter the general characteristics of the surrounding area. Once again, I reemphasize the Planning Board's finding of consistency with the character of the neighborhood and the Comprehensive Plan but more so I also did — I went out on the block in all radiuses, walked the neighborhood as well as compared the tax assessor's records, on the outlining streets predominately single families. On Ash Street there are six duplexes property directly next door and across the street and there were three more on adjoining blocks so there is some resemblance of duplexes and mutli-family [sic] in this neighborhood." (Tr. at 14.)
However, this Court's duty on appeal is not to examine solely the evidence RBSE may have presented in support of its position; rather the Court's duty at this juncture is to determine whether there exists substantial evidence to support the Board's
decision. This Court can find no such substantial evidence in the record. The Board found that the general characteristics of the neighborhood would be altered by doubling the intensification. However, as the number of bedrooms (the doubled intensification) should not be taken into consideration as discussed above, there appears no other reason or further evidence in the record supporting the Board's conclusion. Therefore, the Board's finding that a doubling of intensification would alter the general characteristic of the neighborhood is without substantial evidence and is inadequate to support the Board's decision.
Intensification of Traffic
The Board's second finding in support of its decision is that "the special use permit if granted would effect [sic] the health and safety of the neighborhood by intensifying the traffic." (Tr. at 88.) RBSE contends that the Board's decision on this ground is legally erroneous as the mere "intensification" of traffic is an insufficient basis upon which to deny a special use permit. Additionally, RBSE asserts that there is no substantial evidence in the record which indicates that traffic congestion or hazards would intensify as a result of RBSE's proposal. The Board, in contrast, stresses that there is sufficient evidence in the record to support its decision.
The Supreme Court of Rhode Island has held that an increase in traffic alone is an insubstantial basis upon which to regulate zoning. The Court has repeatedly stated that "A mere increase of traffic at the location of the proposed use unaccompanied by a resulting intensification of traffic congestion or hazard at that site is not a valid zoning criterion." Perron, 117 R.I. at 577,369 A.2d at 642 (citing Bonitati Bros. v. Zoning Bd. of Review,104 R.I. 170, 171, 242 A.2d 692, 693 (1968); Thomson MethodistChurch v. Zoning Bd. of Review, 99 R.I. 675, 682, 210 A.2d 138. 142 (1965)). Thus, it is clear that for a zoning board to deny a special use permit because of an increase in traffic, the board must also demonstrate that either congestion or hazardous conditions will be augmented by the proposed use. However, it is less clear whether the Board here simply denied RBSE's application solely because of an intensification of traffic. While the Board did not state in explicit terms that the proposed development would cause a traffic hazard, it did find that the increased traffic would affect the "health and safety" of the local residents. If the Board found that there would be health and safety problems, this Court may find that the Board implied that a traffic "hazard" would occur. Consequently, the Board did not deny the permit simply because traffic would increase in the area; instead it did so because it felt that the health and safety of the neighbors would be affected. As such, the Perron
holding is inapplicable. However, upon review, this Court finds that there is insubstantial evidence in the record to support the Board's finding that there would be an intensification of traffic detrimental to the health and safety of the neighborhood.
Some of the few pieces of evidence in the record which could possibly indicate that the six unit condominium would increase traffic congestion and hazards are the neighbors' comments made at the May 3, 2005 meeting. The transcript from that meeting is indeed replete with observations and complaints from the neighborhood's residents regarding the current traffic and parking problems. For example, one witness stated that "I see that there's no parking on either side because it's already congested. You can't drive two cars on the street." (Tr. at 43.) Another neighbor testified that "[m]y daughter never goes out into the street because there's cars whipping around the corner . . ." and that at the corner of Ash and South, "you can't stop at the stop sign, there's cars there. You go around the stop sign, there's cars coming down Ash Street that are going to pick you off when you're going by. You can't see." (Tr. at 48.) Yet another neighbor opined that "I could have done the traffic study . . . because I sit there and I watch the traffic every single day at that corner and something is bound to happen the way the parking is." (Tr. at 62.) Many of the other neighbors who spoke also expressed similar sentiments.
Despite the abundance of testimony from the surrounding neighbors, the Supreme Court of Rhode Island has held that "`the lay judgments of neighboring property owners on the issue of the effect of the proposed use on neighboring property values and traffic conditions have no probative force in respect of an application to the zoning board of review for a special exception." Salve Regina College, 594 A.2d at 882 (citingToohey v. Kilday, 415 A.2d 732, 737 (R.I. 1980)). More specifically, "whether traffic congestion or hazard within the zoning contemplation would follow granting of an exception [is] a subject not within the testimonial competence of a witness lacking in expertise." Perron, 117 R.I. at 578 n. 2,369 A.2d at 642 n. 2. The reason that such testimony is without probative force is that the neighboring citizens are not experts in traffic studies and furthermore, there is concern that neighbors' testimony may not be impartial when the neighbors have a personal interest in excluding the use from the area. Salve ReginaCollege, 594 A.2d at 881-82.
With respect to its finding on traffic congestion, the Board argues that the only portions of the neighbors' testimony it relied upon were those relating to the past and present conditions of the neighborhood, not the testimony on the prospective impact of the proposed use. According to the Board, while it is impermissible to rely on lay witness testimony regarding prospective traffic congestion and hazards, neighbors' statements about existing and historical traffic and parking issues in the area are probative evidence. The Board contends that its decision was based on permissible inferences derived from the neighbors' testimony about past and current conditions combined with the expert testimony about the increased number of trips per day.
The Board adverts to Restivo v. Lynch, 707 A.2d 663 (R.I. 1998) to support its position that it was permissible to rely on the neighbors' testimony in a limited scope. In Restivo, the city council relied upon lay testimony of nearby homeowners when denying approval of a proposed subdivision. There, a neighbor testified that he experienced chronic flooding in his yard and basement and that runoff water ran down the road into his backyard. Id. at 668-669. The Court found that such evidence was probative and was appropriately relied upon by the city council. It held:
 "Our brother [in dissent] erroneously suggests that only expert testimony could competently establish the probability of the exacerbation or alleviation of the drainage conditions in the area of the proposed development. But there is no talismanic significance to expert testimony. It may be accepted or rejected by the trier of fact, [citations omitted] particularly when there is persuasive lay testimony on the actual observed effects of prior residential construction. The subject matter here was not so arcane that inferences from factual lay testimony could not be drawn by members of the council based, in part, on their own expertise." Id. at 671.
According to the Board, Restivo stands for the position that a zoning board may appropriately consider lay testimony on preexisting conditions and use that testimony to draw inferences as to what may occur in the future, even in cases such as this where the subject matter is the intensification of traffic hazards and congestion. However, this Court finds that the Board's reliance on Restivo is misplaced.
Restivo is limited to its specific facts. In Restivo, the Supreme Court said that "[h]ere, lay testimony is competent in respect to the presence of water in one's basement and such lay testimony describing physical facts and conditions does constitute evidence from which the planning board could fairly draw inferences." Id. This Court finds that by using the language "in respect to the presence of water in one's basement," the Supreme Court intended to restrict the reliance on lay witness testimony to such a limited circumstance. In fact,Restivo appears to clearly distinguish its facts from those cases involving neighbors' testimony on intensification of traffic, as the Supreme Court explicitly recognized that "[i]nSalve Regina College v. Zoning Board of Review of Newport,594 A.2d 878, 881-82 (R.I. 1991), we held that lay testimony regarding traffic data was not competent and had no probative force." Id. Accordingly, the Restivo decision is distinguishable from that of Salve Regina College.
The Board argues that this distinction is not the subject matter of the lay witness testimony (intensification of traffic v. water run-off); rather, it is the nature of the testimony offered. More specifically, the Board argues that Salve ReginaCollege stands only for the rule that lay witness testimony onpotential traffic problems is inconsequential, but that according to Restivo, lay witness testimony regarding past andcurrent traffic conditions is competent evidence upon which the Board may appropriately rely. However, in limiting the distinction to such a narrow ground, the Board fails to address other cases in which lay witness testimony on past and current traffic congestion and hazards were held to be without probative force. For example, in Toohey, several neighboring property owners spoke in opposition to the proposed special exception to construct a physician's office by testifying that the current traffic conditions are hazardous and congested. Toohey,415 A.2d at 736. Similarly, in Perron, a neighbor spoke in opposition of a proposed campsite simply by stating that the traffic in the area was unduly heavy. Perron, 117 R.I. at 577,369 A.2d at 642. In both of those cases, the testimony was held to be without probative force, and in neither case did the Court articulate a distinction between testimony on past, current, and future traffic hazards. Similarly here, this Court finds that the witness testimony on current traffic conditions is not sufficient evidence upon which the Board can conclude that RBSE's proposed condominium would intensify traffic congestion and hazards.[3]
Furthermore, Restivo is distinguishable from the present matter because in Restivo, while the Supreme Court of Rhode Island found lay witness testimony persuasive, the testimony concerned "actual observed effects of prior residentialconstruction." Restivo, 707 A.2d at 671. (Emphasis added.) In other words, the city council could draw inferences as to what could result from the proposed subdivision because the witnesses' testimony concerned the effects of past construction in the area. Returning to the matter at hand, however, even if the lay testimony could be appropriately relied upon, the specific testimony at issue would have no probative force because it did not concern the effects of any similar construction or development in the neighborhood. If the lay witnesses had testified as to their observations of the traffic conditions that arose from a similar condominium unit that had been developed in the past, then a stronger argument would exist as to why such testimony should be used to draw an inference as to the traffic that will result from RBSE's proposal. However, no such testimony was elicited; consequently, the Board impermissibly relied on the lay testimony of the neighbors as support of its finding that the intensification of traffic would affect the health and safety of the neighborhood.[4]
Even though the neighbors' statements are without probative force, the Board still believes that its decision is supported by substantial evidence, namely the testimony of the traffic expert, James Salem. Salem testified that the proposed development would cause an additional seven vehicle trips per day. (Tr. at 19.) The Board believes that it was allowed to use this evidence to make the inference that those seven additional trips would exacerbate the present traffic conditions, thereby intensifying traffic congestion and hazards. However, though Salem recognized that there would be seven additional trips per day, he also testified that there would be no further traffic delays, circulation would improve, and the "proposed use will not cause congestion nor would it create a hazard." (Tr. at 21-22.) While the testimony of an expert is not dispositive, Restivo, 707 A.2d at 671, the Board is still required to demonstrate that it had substantial evidence upon which to base its decision. Once again, there is no evidence in the record which supports the Board's conclusion.
When the testimony of the objecting neighbors on the issue of potential traffic problems is disregarded as incompetent and therefore lacking in probative value, and the expert has concluded there will be no increase in congestion or traffic hazards, the only evidence left for the Board to rely upon in making its conclusion would be its own personal knowledge and observations of the area. The Supreme Court of Rhode Island has said that "a board may consider probative factors within its knowledge in denying the relief sought or may acquire adequate knowledge through observation and inspection on a view."Toohey, 415 A.2d at 737. However, "[a] decision reached by the board pursuant to such special knowledge will not be upheld . . . unless the record reveals the underlying facts or circumstances the board derived from its knowledge of the area." Harrison v.Zoning Bd. of Review, 74 R.I. 135, 141-42, 59 A.2d 361, 364
(1948) (citing Perron, 117 R.I. at 576, 369 A.2d at 641). Here, the record fails to reveal the particular evidence upon which the Board relied or whether they even did rely on their own observations or special knowledge. Since there are no findings of fact upon which the Board's decision can rest, the Board's decision denying RBSE's application is hereby reversed.[5]
Remedy
The Town of Lincoln Zoning Ordinance § 260-67 sets forth the standards an applicant for a special use permit is required to satisfy to obtain approval. When it denied RBSE its special use permit, the Board rested its decision on two findings: a) the proposal would alter the general characteristic of the neighborhood and b) increased traffic would affect the neighbors' health and safety. However, these two findings were based on insubstantial evidence and are thus reversed. RBSE has presented sufficient evidence to support the remaining requirements of § 260-67 and therefore, it shall be awarded its special use permit.
Zoning Ordinance § 260-67 (A) requires evidence that the special use requested is specifically authorized under the Zoning Ordinance. It is undisputed that multifamily housing is a specially permitted use in an RG-7 zoning district;[6]
thus, RBSE has satisfied the first element in § 260-67. Next, pursuant to § 260-67 (B), an applicant for a special use permit is required to demonstrate that the special use meets all of the criteria authorizing such special use. Here, Board member Russo's motion, which was approved, contained the following: "I find that the applicant has satisfied the first condition in that the use is permitted by Article 2 A Section 2.3, that certainly demonstrated the special use permit meets all the criteria for the zoning ordinance such as parking, lighting, and use regulations." (Tr. at 88.) Consequently, within the record is the finding that the special use satisfies the requirements of the Zoning Ordinance, thereby simultaneously fulfilling § 260-67 (B).
When determining whether to issue a special use permit, the Board is further required to find sufficient evidence that "the granting of the special use permit will not alter the general character of the surrounding area." § 260-67 (C). As discussed above, the Board found that the permit would affect the character of the neighboring property; however, this finding was based on insubstantial evidence and is reversed. This Court also finds that there is no additional evidence in the record which could support the Board's finding that the general character of the surrounding area would be impermissibly altered. Therefore, § 260-67 (C) has also been satisfied.
Finally, in accordance with § 260-67 (D), an applicant is entitled to a special use permit when evidence in the record establishes that "[t]he granting of the special use permit will not impair the intent or purposes of this chapter, nor the Comprehensive Plan." While the Board did not render a specific finding on whether the permit would be inconsistent with the intent of the Comprehensive Plan, the evidence in the record indicates that RBSE's proposal is consistent with the Comprehensive Plan. For instance, land planning expert Edward Pimentel testified that the development "meets the goals and objectives of the Comprehensive Plan." (Tr. at 16.) More importantly, in its May 2, 2005 letter of recommendation to the Zoning Board, the Planning Board stated that "granting this special use permit will not alter the general character of the surrounding area nor impair the intent or purpose of the Zoning Ordinance, nor the Comprehensive Plan." There is no further evidence in the record upon which the Board could find that the intent and purpose of the Zoning Ordinance and Comprehensive Plan would be harmed were the special use permit granted. Consequently, this Court finds that evidence in the record established that § 260-67 (D) has been satisfied. As all of the requisites for entitlement to a special use permit as set forth in § 260-67 have been met, RBSE shall be awarded its special use permit in the form that was submitted in its original application.
RBSE has also requested that it be awarded reasonable attorney fees pursuant to the Equal Access to Justice Act, § 42-92-1 et seq. Under the Equal Access to Justice Act, a prevailing plaintiff is entitled to reasonable attorney fees when an agency action was without substantial justification. Id. "Substantial justification means that the initial position of the agency, as well as the agency's position in the proceedings, has a reasonable basis in law and fact." § 42-92-2 (7). The Supreme Court of Rhode Island has held that in applying the substantial justification test, "the Government now must show not merely that its position was marginally reasonable; its position must be clearly reasonable, well founded in law and fact, solid though not necessarily correct." Taft v. Pare, 536 A.2d 888, 893 (R.I. 1988). Here, while the Board's decision was not necessarily correct, this Court holds that the Board could have reasonably believed that it was acting properly under the law and facts. In other words, the Board did not act so egregiously as for this Court to award attorney fees. Consequently, RBSE's request for attorney fees is denied.
 Conclusion
This Court finds that there is no reliable, probative, and substantial evidence in the record to support the Board's findings that RBSE's proposed condominium development would 1) double the intensification of the current use and thereby alter the characteristic of the neighborhood and 2) affect the health and safety of the neighborhood by intensifying traffic. There is no other substantial evidence in the record upon which the Board could have denied RBSE's application. Consequently, the Board's decision is reversed, and RBSE shall be awarded its special use permit in the form that was submitted in its original application. RBSE's request for attorney fees is denied.
Counsel shall agree upon an appropriate form of order and judgment, reflective of this decision, and submit it to the Court forthwith for entry.
[1] While the Board found that DeGregorio was qualified as a real estate expert, they refused to recognize him as an appraiser, as DeGregorio was not licensed as an appraiser. (Tr. at 32.)
[2] During the hearing, RBSE proffered an alternate proposal, which would provide four additional parking spaces. (Tr. at 26, 80.) However, it appears from the transcript that the Board did not consider this second proposal as it was not submitted as part of the original application. (Tr. at 83-84.)
[3] Even if the Board could have relied on the neighbors' testimony about past and present traffic conditions, such testimony would likely have little or no probative force as the testimony may be prejudiced with bias due to the neighbors' own personal interests in the matter. See Salve Regina College,594 A.2d at 881.
[4] RBSE further argues that all of the neighbors' testimony on the traffic congestion and hazards show that such problems only arise from illegal parking on the road. According to RBSE, the traffic hazards and congestion that are caused by the illegal operation of motor vehicles cannot serve as grounds to deny a special use permit when those traffic problems would cease to exist were vehicle operators to follow the law. In support of its position, RBSE cites to Sprague v. Zoning Bd. of Review,
2004 R.I. Super LEXIS 166 (Sept. 21, 2004). There, the court found that illegal speeding by third parties could not be considered a ground for denying a request to subdivide the property. Id. at *42. It reasoned:
 "Here, the alleged safety hazard . . . does not inhere in the placement of the Amber Way intersection. Rather, it is only when, subsequently, travelers approach the intersection at an illegal speed that safety becomes an issue. To allow an unidentified, third party's prospective violation of the law to work as a restriction upon an otherwise conforming subdivision would open the door to flagrant abuses and egregious injustices." Id.
RBSE contends, accordingly, that the illegal parking cannot be taken into account to determine if traffic hazards or congestion would intensify. With this assertion the Court agrees, however, RBSE fails to recognize that not all of the neighbors discussed the illegal parking when describing the preexisting traffic problems. However, as this Court finds that all of the neighbors' testimony on traffic conditions is without probative force on other grounds, it need not conclude that the testimony should be excluded on the grounds that some testimony concerned illegal parking.
[5] RBSE further contends that the Board erred by refusing to consider its alternative proposal, which would provide additional parking on the property. The Board, though, was not required to vote on the second proposal as RBSE did not follow the procedural requirements for filing an application for its second proposal pursuant to § 260-66 of the Zoning Ordinance. However, if the Board felt that RBSE's initial proposal would adversely affect the surrounding neighborhood, it should have at least considered imposing safeguards and conditions which would have protected the area from such deleterious effects. Perron,117 R.I. at 575, 369 A.2d at 641 (citing Zoning Bd. of Adjustment v. DragonRun Terrace, Inc., 222 A.2d 315, 318 (Del. 1966)). (Emphasis added.)
Here, it appears that the Board denied the application, in part, on its finding that traffic would intensify, affecting the health and safety of the neighbors. Consequently, the Board should have considered other safeguards, such as the increased parking offered in the form of RBSE's alternative proposal, which could possibly have alleviated the Board's traffic concerns.
[6] See Town of Lincoln Zoning Ordinance, Table of Uses.