**ZONING BOARD OF ADJUSTMENT OF NEW CASTLE COUNTY, Delaware, Appellee Below, Appellant,**

v.

**DRAGON RUN TERRACE, INC., a corporation of the State of Delaware, Appellant Below, Appellee.**

Supreme Court of Delaware.

Aug. 10, 1966.

See also Del., 216 A.2d 146.

Clarence W. Taylor, of Hastings, Taylor & Willard and Arthur J. Sullivan, of Morris, James, Hitchens & Williams, Wilmington, for appellant.

Ralph F. Keil and Carl Goldstein, of Keil & Keil, Wilmington, for appellee.

CAREY and HERRMANN, Justices, and WRIGHT, Judge, sitting.

CAREY, Justice.

This is an appeal from a decision of the Superior Court which reversed a denial of a permit to operate a trailer or mobile home park in the unincorporated community of Kirkwood. The basic issue is whether the Zoning Board of Adjustment abused its discretion or committed an error of law in refusing the permit.

In accordance with the authority conferred by T. 9 Del.C. Ch. 26, the Levy Court of New Castle County enacted a Zoning Code for the entire county outside of incorporated communities. Appellee's land is located in an R-2 District—agricultural and general purposes. Despite the use of the letter "R" in this classification, it is not a residential district, as are the other "R" districts. The Code explains that this designation is used to describe certain large undeveloped areas for which the purpose cannot yet be determined. The Code contemplates possible rezoning of R-2 districts, depending upon future developments.

Trailer parks are not permitted in R-1 and R-3 districts, which are one-family and group housing residential areas, respectively. They are permitted in R-4 districts, which is multifamily residential, under the same conditions applicable in R-2 areas. These conditions are set forth in Art. IV § 2(8) of the Zoning Code as follows:

"(8) Trailer park, if granted a permit by the Board of Adjustment as provided in Section 4 of Article XVIII of this Code, subject to conformance with the following requirements:

(a) The minimum size of the lot upon which such use is located shall be two acres.

(b) All access roadways and trailer parking berths shall be paved with a dust-proof surface.

(c) Each trailer parking berth shall have a minimum area of fifteen hundred (1,500) square feet and a minimum width of thirty (30) feet and no such parking berth shall project beyond the required building set-back line nor be located within the required side yards or rear yard.

(d) A site plan showing roadways, parking berths, landscaping, lighting, and provision of sanitary facilities shall be filed with the application for a certificate of occupancy and, if approved, shall be part of the provisions for the issuance of a certificate.

(e) Approved by the State Board of Health of proposed sanitary facilities shall be a prerequisite to the issuance of a certificate of occupancy."

Art. XVIII authorizes the Board of Adjustment to grant special permits in certain districts (including R-2) for trailer parks subject to the special requirements quoted above. That Article also requires hearings by the Board to consider applications for special permits and contains the following language in § 2:

"No special permit shall be granted by the Board without considering the effects upon the neighborhood and the county. A special permit may be issued containing such conditions as will protect the community and such conditions shall be specified in writing in the special permit. If a special permit would result in substantial injury it shall be refused. A certificate of occupancy must be obtained in all cases where a special permit is issued by the Board."

Counsel agree that any decision of the Board must be guided by Article XIX § 1 which contains the following language:

"Section 1. INTERPRETATION OF REGULATIONS—In their interpretation and application the provisions of this Code shall be held to be the minimum requirements adopted for the promotion of the public health, safety, morals, convenience, order, prosperity, or general welfare; for the lessening of congestion

in the streets or roads or reducing the waste of excessive amounts of roads; for securing safety from fire and other dangers, providing adequate light and air, and preventing on the one hand excessive concentration of population and on the other hand excessive and wasteful scattering of population or settlement; for promoting such distribution of population and such classification of land uses and distribution of land development and utilization as will tend to facilitate and provide adequate provisions for public requirements, transportation, water flowage, water supply, drainage, sanitation, educational opportunities, recreation, soil fertility, and food supply; and for protection of the tax base, securing economy in governmental expenditures, fostering the State's agricultural and other industries, and the protection of both urban and non-urban developments * * *.".

We emphasize the fact that we are not here dealing with a proposed *variance* but with a *special permit or exception,* a distinction which was noticed in Appeal of Hickman, 10 Terry 13, 108 A.2d 667.[1] In contrast to the City ordinance described in Searles v. Darling, 7 Terry 263, 83 A. 2d 96, and Appeal of Hickman, supra, both the County ordinance and the Act of Legislature upon which is founded fully observe this distinction, and impose the requirement of a showing of hardship only upon variances. There is no similar requirement for special permits. This case is therefore distinguishable from both Searles and Hickman, supra. Cf. Montgomery County v. Merlands Club, 202 Md. 279, 96 A.2d 261.

The Board in its ruling specifically mentioned seven reasons for denying the permit. They will be discussed later. Appellant argues here, and appellee denies, that the Board relied also upon an eighth reason, i. e., lack of need for the facility.

The Court below held that this point was not before it. There are authorities supporting the view that lack of need does not alone justify refusal of a permit for a use which the legislative body has found to be generally compatible with other permitted uses. See Texaco, Inc. v. Board of Adjustment of Milburn, 73 N.J.Super. 313, 179 A.2d 768; 2 Rathkopf on Zoning and Planning (3d ed.) 54–18, 1965 Supplement. We do not decide the point because, as the Court below pointed out, the record before us contains no evidence to support the finding in any event. To clarify this statement, we will outline the contents of the record having any bearing on the question.

An application for a permit was made by appellee some time prior to December, 1961, and was denied by the Board on the ground of lack of need. A new application was filed and a hearing thereon took place on December 14, 1961. At that time, the Chairman announced that, since the earlier petition had been denied solely because of a failure to demonstrate need, the new hearing would be limited to that question. He further stated that, if the Board later found it necessary to consider other matters, an additional hearing would be held. The petitioner then introduced certain evidence, consisting largely of statistics, tending to show a need for the facility. The Board as then constituted never decided the matter because a majority of the members were soon replaced by new individuals. The newly constituted Board ultimately agreed to hold an additional or supplemental hearing at which proponents and opponents could produce any pertinent evidence they desired, which would be considered along with the evidence previously presented. This supplemental hearing was held on March 12, 1964. No additional evidence was then introduced upon the question of need. In making its finding, the Board stated that "its decision concerning this subject (need)

---

1. In 2 Rathkopf on Zoning and Planning (3d. ed.) 54–1, the suggestion is made that a more accurate description would be "conditional use" permit.

has basis in fact, based on the testimony presented at the public hearing of which this subject decision was the Board's subsequent action".

The only evidence on the point in the record before us is that which was presented in December 1961; it tends to show the existence of a need rather than its nonexistence. The record includes some reference to certain trailer parks then existing, and the members of the Board undoubtedly had some personal knowledge of their number and size; the difficulty is that this information is not disclosed in the record. In short, the record by which we must judge the case completely fails to justify any finding of lack of need.

■ It is manifest from questions asked by members of the Board at the hearing that, in considering various aspects of this case, they were relying upon facts known to them personally but not made a matter of record by proper evidence. Our various administrative and quasi-judicial bodies should understand that any pertinent information known personally by the members, but not placed into the record by proper evidence, cannot be considered by a court on appellate review. See Fitzsimmons v. McCorkle, Del., 214 A.2d 334; 2 Am.Jur.2d 623. This requirement applies to zoning matters, 2 Rathkopf on Zoning and Planning (3rd Ed.) 64–67.

As we have said, the Board gave seven specific reasons for denying the permit. One—having to do with lot sizes—has been abandoned by stipulation. The other reasons were all found inadequate by the Court below. We agree.

■ Two of the reasons are somewhat similar and may be considered together. One is that the applicant had failed to secure current approval of the State Board of Health for its sanitary facilities. The other is that the development may be a menace to the public health by possible pollution of Dragon Run Creek. The Zoning Code requires approval of

proposed sanitary facilities by the Board of Health before a certificate of occupancy may be issued; it does not require that approval before the permit issues. Actual use of the premises cannot be commenced until the certificate is granted. The Code itself, therefore, shows that the question of sanitary facilities is a matter for the health authorities. If appellee cannot satisfy their requirements, it cannot operate the park; the Board of Adjustment has no power to deny the permit solely on this ground. The finding concerning pollution of the creek is a finding of nothing more than a possibility, not probability; the evidence on which it is based is simply the expression of fears of pollution by lay witnesses; no reason appears in the record why any possibility thereof cannot be eliminated by proper safeguards. Although public safety is a proper matter for the Board's consideration, the mere possibility of contamination of a stream is clearly insufficient to justify the denial of an otherwise permitted use, at least when there is no evidence to indicate that the possibility cannot be avoided by adequate methods. Our health authorities have ample authority to control the situation. See Crowther, Inc. v. Johnson, 225 Md. 379, 170 A.2d 768.

■ A fourth reason given by the Board for its action is that the park would be detrimental to the non-urban development in the general area. Here again the Board may have considered matters within the personal knowledge of the members but not in the record. As we have said, R–2 is not a residential classification. When the Code was adopted, the area here involved was considered undeveloped and its ultimate purpose could not be determined. If, in the interim, portions of it have developed to such an extent as to demonstrate some specific trend, one would have expected a rezoning of those portions by the Levy Court, to which has been delegated the legislative function and power to do so. There is testimony in the record that there are some private residences near the pro-

posed park, but there is no indication that the neighborhood has developed to the extent that it can properly be called a residential neighborhood. On the other hand, there is positive testimony that appellee's land is not suitable for either private dwellings or farming. It is true that the Board found the park "could be a detriment to future permanent development in the general area". Here again, the Board seems to have been dealing with mere possibilities; it does not say in its finding that the area has developed or is developing into a private residence area; it simply states that "where residential development has taken place, the development is of a permanent type". In any event, we agree with the Court below that there is no substantial evidence in the record to support the Board's conclusion.

■ A fifth reason assigned is that appellee failed to demonstrate that a trailer park is the highest and best use for the land. Since it seems that the land is not suitable for private dwellings or farming, just what use would be the highest and best within the list of permitted uses is hard to picture. In any event, we are unable to find anything in the Zoning Code which imposes this requirement upon an applicant. We accordingly hold that this theory does not justify the Board's action.

■ A sixth reason is a finding that the park would be deterimental to the tax base. In ruling against this contention, the Court below said:

"The Board found that the development of the trailer park would be detrimental to the tax base. In support of this finding, the Board made a subsidiary finding that the development of the trailer park will lower the property values in the general area, but there is no evidence in the record to support this subsidiary finding. With respect

to the general finding, the Board quarrels with the allegedly low rate of personal property taxation upon trailers prevailing in this State as compared with the taxation allegedly gained from owners of permanent homes. In the first place, the evidence is compelling that only trailers could be put upon the land in question, and, accordingly, there would appear to be no tax loss but rather a tax gain. Secondly, there is no evidence to support the findings of the Board that the county could not receive an adequate amount of taxation from the owners of the trailer park itself. Thirdly, and most importantly, the Board has endeavored to substitute its judgment for the public policy of the State, which currently fixes the tax rate for trailers. If such a tax rate is inequitable, the appropriate course of action is a legislative change rather than administrative prohibition of trailers in an area where trailer parks are clearly a permitted use. See Beach v. Planning and Zoning Commission [141 Conn. 79], 103 A.2d 814".

It will suffice here to say that we agree with the quoted statements.[2]

The final reason given is that the trailer park would create a severe strain on the school system of the area. This finding is based solely upon the theory that trailer and mobile home owners do not pay a proper amount of tax in comparison to other property owners, that the influx of people coming to the park would include a number of children, and that the other property owners would thus be unfairly subjected to additional taxation without receiving any additional benefit. The theory is simply another way of saying that the park would be detrimental to the tax base—a proposition we have already discussed.

■ In the final analysis, under Art. XVIII, Sec. 2 of the Zoning Code, the Board is empowered to refuse the subject

2. We note that provision has now been made for assessing county and school taxes against mobile homes by an Act approved on December 22, 1965. 55 L. of D. Ch. 275.

permit if its "issuance would result in substantial injury" to the "neighborhood and county". In the absence of any substantial evidence in the record of such "substantial injury", the refusal of the Board to issue the permit must fall.

We are of the opinion that the lower Court was correct in reversing the Board's action. Its judgment must be affirmed, with one modification. Art. XVIII, Sec. 2 gives the Board the responsibility of specifying on any permit issued "such conditions as will protect the community". The Board should be given the opportunity of fulfilling this function. Accordingly, the case should be remanded to the Board with instructions to issue the permit under such conditions, if any, as may be necessary to protect the community.