IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR SUSSEX COUNTY

PROTECT OUR INDIAN RIVER, : 
JOSEPH MEYER, CHERYL : 
MEYER, RAY WHARTON, : 
GERALDINE WHARTON, : 
JOANNE HAYNES, KENNETH : 
HAYNES, DONNA SKIBBE, and : 
LEWIS PODOLSKE : 
  : 
  :     C.A. No. S18A-08-003 RFS
  : 
     Petitioners, : 
  : 
v. : 
  : 
SUSSEX COUNTY BOARD OF : 
ADJUSTMENT and ALLEN : 
HARIM FOODS, LLC, : 
  : 
     Respondents. : 

## **MEMORANDUM OPINION**

Date Submitted: February 8, 2019
Date Decided: May 17, 2019

*Upon Appeal from a Decision of the Board of Adjustment of Sussex County.*
*Affirmed.*

Andrea G. Green, Esq., Law Office of Andrea G. Green, LLC, 28412 Dupont Blvd., Suite 104, Millsboro, Delaware 19966, Attorney for Petitioners.

Robert G. Gibbs, Esq. and R. Eric Hacker, Esq., Morris James, LLP, 107 W. Market Street, Georgetown, Delaware 19947, Attorneys for Respondents.

**STOKES, R. J.**

## I.  INTRODUCTION

Presently before the Court is a certiorari appeal from a decision of the Board of Adjustment of Sussex County ("Board", "BOA" or "Respondent") brought by Protect Our Indian River, Joseph Meyer, Cheryl Meyer, Ray Wharton, Geraldine Wharton, Joanne Haynes, Kenneth Haynes, Donna Skibbe, and Lewis Podolske ("Petitioners" or "Protect Our Indian River"). Petitioners seek to reverse the Board's decision that Allen Harim Foods, LLC's ("Harim" or "Respondent") application has met the requirements needed to establish a special use exception for a chicken processing, packaging and deboning plant. Harim supports the decision of the Board. The Court AFFRIMS the decision of the BOA for the reasons discussed below.

## II.  FACTS

Harim applied for, and the Board granted, a special use exception for a potentially hazardous use, to process and debone poultry products, and to freeze, package and ship retail poultry products. Harim filed the application on January 30, 2018, and the Board conducted a public hearing on the application on March 19, 2018. On May 7, 2018, the Board discussed and considered the application and approved the special use exception subject to two conditions. The conditions were (1) the approval is limited to a poultry deboning and packing facility of a size and scope proposed by Harim, and (2) that Harim's spray irrigation system, updated with new technology, be up and running prior to operation. On July 10, 2018, the Board issued its written decision granting the special use exception, subject to the two conditions listed above.

Prior to the current disputed application Harim had been approved to renovate and utilize the entire facility as a chicken processing plant in 2013. This application allowed Harim to complete the entire processing operation, including deboning and packaging, the last two steps of the

1

processing process.[1] The first approved application was appealed to the Delaware Superior Court and was upheld.[2] Protect Our Indian River was one of the appellants and appealed that decision to the Supreme Court of Delaware. The Supreme Court upheld the decision of the Superior Court.[3] However, Harim never utilized the grant of special exception and the property never was used as a poultry processing plant and the special exception lapsed.

Currently, Harim seeks another special exception to utilize a portion of the facility as a limited poultry processing, deboning and packing facility. The application specifically states that the use will not include the slaughtering of animals. The use in question is smaller in scope than the use for which Harim sought and obtained approval in the first application. The limited processing would require less overall square footage of the building, less employees, less truck traffic, and a fraction of the estimated wastewater output compared to the first application.[4] The property is situated in a heavily industrialized area, in conformity with the HI-1 (Heavy Industrial) zoning, under the Sussex County Code. Harim's specific intended use of the property, as a limited poultry processing plant, is subject to the Sussex County Code Section 115-11[5] which applies only to "potentially hazardous uses" in the HI-1 zone. Harim reached out to several state agencies including Delaware Department of Natural Resources and Environmental Control ("DNREC'), the Office of the State Fire Marshall, the Delaware Department of Transportation("DelDOT"), the Chief Building Code Inspector of Sussex County, the Sussex Conservation District, Natural Resources Conservation, and Division of Soil and Water. None of the state agencies mentioned above oppose the application.

[1] Hearing Tr. 23-24:10-24; 1-24, March 19, 2018
[2] *Protect Our Indian River v. Sussex Cnty. Bd. of Adjustment*, 2015 WL 4498971 (Del. Super. Ct. 2015).
[3] *Protect Our Indian River v. Sussex Cnty. Bd. of Adjustment*, 133 A.3d 981 (Del. 2016).
[4] Hearing Tr. 24:1-24, March 19, 2018.
[5] The text of this Code Section appears at pages 4-5 of this decision.

The public was notified on February 26, 2018, of the upcoming hearing concerning the application. At the hearing, on March 19, 2018, in front of the Board, Harim produced a voluminous exhibits package and presented evidence to the Board. This evidence included the history of the property, steps Harim would take to reduce any detrimental impact on the surrounding area and the environment, the previously approved application and its supporting documents, and testimony from supporters of the application such as a local farmer. The Board also heard testimony in opposition to the application. Generally, the opponents' concerns focused on fears of traffic or pollution. In particular, one person in opposition to the application submitted a health study from the University of Maryland. The Board heard and considered all of the evidence presented to it. Ultimately, the Board unanimously granted the special use exception to Harim in a 4-0 vote.

Despite the fact that the second application is less burdensome than the original, Petitioners assert five grounds upon which they maintain that the decision issued by the Board was improper: (1) the findings of fact fail to accurately represent the actual testimony presented before the Board, thereby demonstrating a lack of substantial evidence to satisfy the legal standards for granting a special exception and rendering the decision arbitrary and unreasonable; (2) lengthy and detailed information and studies were presented by Harim at the hearing, without any prior opportunity for the Petitioners or other members of the public to study or review them, thereby depriving Petitioners of a reasonable notice and opportunity to be heard; (3) lack of jurisdiction based upon an incomplete application by Harim; (4) the Board demonstrated a clear bias in favor of Harim and against Petitioners; and (5) the Board demonstrated a failure to meet its obligation to protect the public health, safety, morals and general welfare.

3

## III. STANDARD OF REVIEW

The standard of review for appeals from a Board of Adjustment decision is limited to the correction of errors of law and determination of whether substantial evidence exists in the record to support the Board's findings of fact and conclusions of law.[6] Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[7] If the Board's decision is supported by substantial evidence, a reviewing court must sustain the Board's decision even if such a court would have decided the case differently if it had come before it in the first instance.[8] "The burden of persuasion is on the party seeking to overturn a decision of the Board to show that the decision was arbitrary and unreasonable."[9] Questions of law are reviewed *de novo*.[10] In its appellate review, the Superior Court after examining the record may "reverse or affirm, wholly or partly, or may modify the decision brought up for review."[11]

## IV. DISCUSSION

*A. The Record Reflects Substantial Evidence was Submitted to the Board Demonstrating the Public Health, Safety, Morals and General Welfare Will Be Properly Safeguarded and the Board Contacted Relevant Agencies in Order to Make a Determination.*

The Board's decision was supported by substantial evidence on the record. Section 115-111 of the Sussex County Code states in relevant part,

> The Board shall review the plans and statements and shall not permit such buildings, structures or uses until it has been shown that the public health, safety, morals and general welfare will be properly protected and that necessary safeguards will be provided for the protection of water areas or surrounding properties and persons. The Board, in reviewing the plans and statements, shall consult with other agencies created for the promotion of public health and safety and shall pay particular attention to

---

[6] *Janaman v. New Castle County Bd. Of Adjustment*, 364 A. 2d 1241, 1241 (Del. Super. Ct. 1976).
[7] *Miller v. Bd. Of Adjustment of Dewey Beach*, 1994 WL 89022, at *2 (Del. Super. Ct. Feb. 16, 1994).
[8] *Mellow v. Bd. Of Adjustment of New Castle County*, 565 A. 2d 947, 954 (Del. Super. Ct. 1988), *aff'd*, 567 A. 2d 422 (Del. 1989).
[9] *Id.* at 556.
[10] *Teckstrom, Inc. v. Savla*, 2006 WL 2338050, at *4 (Del. Super. Ct. July 31, 2006).
[11] 9 *Del. C.* § 6918(f).

4

protection of the county and its waterways from the harmful effects of air or water pollution of any type.

As it did in connection with the 2013 application, Harim submitted numerous exhibits and testimony to support the application for a special use exception. Included in Harim's documents were a summary of the special use exception requirements and a detailed response on how potential concerns would be addressed. Also, Harim compiled a list of various requirements from state and federal agencies, including: Sussex County Building Inspector, Delaware State Fire Marshall, Delaware Department of Transportation("DelDOT"), Delaware Department of Resources and Environmental Control ("DNREC"), and the United States Department of Agriculture ("USDA"). Furthermore, Harim submitted the record compiled from the approved 2013 application.

In addition to the exhibits and testimony submitted by Harim, other administrative agencies were contacted concerning the status of the application. In fact, the Board was required to consult with other agencies pursuant to Sussex County Code Section 115-111. In compliance with this provision, the Board solicited comments from various state agencies as it did in the 2013 application.[12] The agencies from which the Board solicited comment include DNREC, DelDOT, Delaware State Fire Marshal, the Chief Building Code Inspector for Sussex County, and Sussex Conservation District. No objections were raised by any of the authorities contacted by the Board. However, DelDOT and DNREC mentioned requirements Harim would have to meet in order to obtain permits. These agencies have the authority to review the project for permitting purposes and request updates should there be any modification to the project.[13] State agencies continued monitoring of the proposed application provides assurances that the public health, safety, moral and general welfare will be properly protected.[14]

---

[12] *Protect Our Indian River*, 2015 WL 4498971, at *13 (Del. Super. Ct. 2015)
[13] *Id.*
[14] *Id.*

5

Next, Petitioners contend the Board's failure to solicit comments from additional agencies merits reversal of the Board's opinion. Particularly, Petitioners believe that the Board was required to seek input from the Division of Public Health and Delaware Health and Social Services. Petitioners are under this belief because the mission statement of Delaware Health and Social services is "to improve the quality of life for Delaware's citizens by promoting health and well-being, fostering self-sufficiency, and protecting vulnerable populations."[15] This argument is essentially the same as the argument Protect Our Indian River raised against the 2013 Harim application.

The Superior Court, in its decision on the 2013 application, described at length what agencies the Board needed to contact under Sussex County Code 115-111.[16] The Court held that the standard is flexible and that it provides discretion to the Board concerning what and how many agencies the Board must contact, and to what extent the Board is required to consult with those agencies.[17] Thus, the Board's decision was not inherently flawed because the Board was not under a duty to consult with the universe of agencies.[18] Furthermore, the Court held that the agencies that the Board contacted in connection with the 2013 application (the same agencies contacted in connection with the current application) were sufficient to establish substantial evidence when taken together with the evidence presented by Harim.[19] The Court also held, and the Delaware Supreme Court has acknowledged that, the Board was allowed to rely on permitting agencies to perform their statutory duties.[20] Therefore, the Court holds that the agencies contacted, along with

---

[15] Petitioners Opening Brief at 10, *Protect Our Indian River et. al. v. Sussex County Board of Adjustment and Allen Harim Foods, LLC.*, No. S18A-08-003 RFS (Del. Super. Ct. Dec. 3, 2018).
[16] *Protect Our Indian River*, 2015 WL 4498971, at *14 (Del. Super. Ct. 2015).
[17] *Id.* at 13.
[18] *Id.*
[19] *Id.*
[20] *Id.* at 14 citing *Zoning Bd. of Adjustment of New Castle Cnty. v. Dragon Run Terrace, Inc.*, 222 A. 2d 315, 318 (Del. 1966).

6

the information presented by Harim in the current application and the 2013 application, is sufficient to uphold the Board's decision and the Board was not required to contact the specific agencies brought up by Petitioners.

Finally, Petitioners contend that the Board improperly considered the 2013 application in ruling on the current application. Petitioners assert that this application must be considered on its own merits and whether the applicant has satisfied the standard as set forth in the Sussex County Code. Respondents argue that collateral estoppel precludes the re-litigation of issues in this suit that were previously heard in the first case. The rules regarding the finality of decisions in zoning cases are no different from such rules in other areas of the law.[21] In particular, the principles of res judicata and collateral estoppel apply in zoning cases and have resulted in the rule that ordinarily a board of appeals or adjustment has no power to reopen or review its own decision by vacating, revoking, rescinding or altering it after it has been made.[22] Collateral estoppel is applicable where (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.[23] Here, neither the parties nor the factual issues are identical and collateral estoppel should not apply.

However, Boards in Delaware are allowed to consider prior special use applications and are in fact sometimes required to consider a prior application.[24] Even if a landowner does not act on a

---

[21] *Kollock v. Sussex County Bd. of Adjustment*, 526 A. 2d 569, 572 (Del. Super. Ct 1987).
[22] *Id.*
[23] *Betts v. Townsends, Inc.*, 765 A. 2d 531, 535 (Del. 2000).
[24] *Kollock*, 536 A. 2d at 572 (holding that while a board of adjustment cannot change a decision once made, it can consider a new application for similar relief if there has been a substantial change in the circumstances or conditions affecting the property or in the proposed use or plans for the use).

7

prior approved use within the prescribed amount of time, as Harim did here, a former decision of a Board should bind the Board in the future so long as the facts do not change.[25] Here, a substantial change in the use has occurred as Harim's current application is a much less intensive use than the original 2013 application. The Board was presented with and properly considered the facts of the previously approved special use exception, which the Superior Court of Delaware approved and the Supreme Court of Delaware confirmed. The Board concluded that the public health, safety, morals and general welfare were properly safeguarded when it approved the 2013 application. Presently, the Board properly considered the changes in circumstances between the 2013 and 2018 applications, namely, that the current application is less onerous than the previously considered application, in determining that the public health, safety morals and general welfare are properly safeguarded. Therefore, the Board properly considered Harim's 2013 application in making its determination on the current application.

*B. The Board Conducted a Fair and Lengthy Hearing, Weighed All Evidence, and Did Not Exhibit Bias Towards Either Party and Due Process Requirements Were Satisfied.*

Generally, Delaware law ensures that members of the public have a right to be heard prior to granting a special use exception.[26] The Board timely published notice of the hearing and the public participated in the hearing. A fair reading of the transcript, Minutes and Findings of Fact show that there was no bias in the Board's approval process. The transcript of the hearing was nearly 200 pages long and both those in favor and those opposing the application were permitted to speak and bring forth evidence concerning the application. Specifically, Petitioners who opposed the application presented the Board with a Health Study from the University of

---

[25] Stewart E. Sterk & Kimberly J. Brunnelle, *Zoning Finality: Reconceptaulizing Res Judicata Doctrine in Land Use Cases*, 63 Fla. L. Rev. 1139, 1159 (2011).
[26] *Tarapchak v. Town of Bethany Bd. of Adjustment*, 1998 WL 109829, at *3 (Del. Super. 1998).

Maryland, statistics about disease and cancer rates in Delaware, and concerns about traffic and odors at Harim's Harbeson facility.

Petitioners claim that the Board was biased because Petitioners were told "we're not talking about Harbeson" when they presented the Board with testimony concerning odors and traffic at Harim's Harbeson facility, but the Board did not have this reaction when the expert for Respondent spoke about another company's odor. Also, Petitioners believe that they were treated unfairly when they brought up a University of Maryland study. Specifically, Petitioners are concerned that the Board responded to the study by stating, "that is not Delaware", and that "some of them come down here with that problem though" in response to health issues addressed in the study. Petitioners believe that the Board summarily dismissed both of their witnesses' concerns and a university scientific study.

However, Petitioners claim that the Board is biased is simply unfounded. Under Delaware law, a zoning authority should not defer to opponents' generalized concerns without specific evidence about the threat posed by the application in question.[27] The expression of fears by witnesses or the mere possibility of negative future events is clearly insufficient to justify the denial of an otherwise permitted use.[28] Moreover, in order for a decision to be arbitrary and capricious, a decision must be the product of an unreasoned, irrational or unfair process.[29] Petitioners have not met this standard.

As the finder of fact, the Board is tasked with weighing and determining the credibility of the evidence presented to it. Therefore, it is appropriate for the Board to question Petitioners. Here, the Board simply requested that Petitioners connect their concerns to the present application.

---

[27] *Gibson v. Sussex Cty. Council*, 877 A. 2d 54, 78-79 (Del. Ch. 2005).
[28] *Dragon Run Terrace, Inc.*, 222 A. 2d at 318 (Del. 1966).
[29] *Save Our Cty. Inc. v. New Castle Cty.*, 2013 WL 2664187, at *9 (Del. Ch. 2013).

Traffic/odor from a plant in another location with a different process, and general health problems present in the state are not directly related to the application of the property in question and just because the Board points this out does not demonstrate bias. Moreover, the Board still took this testimony into consideration and weighed it against all of the other evidence presented. Ultimately, the Board ruled in favor of Harim because it believed that Harim's evidence outweighed Petitioners' evidence, which failed to correlate to the present application, despite direct requests from the Board to do so. Just because Petitioners disagree with the Board's analysis and conclusion, that does not demonstrate bias, or an arbitrary and capricious conclusion. Thus, Petitioners' allegations are insufficient to overcome the "strong presumption" of the honesty and integrity of the administrative adjudicators.[30]

*C. The Board had Authority to Consider the Application and A Traffic Study is Not Required.*

As discussed at length in the 2015 *Protect Our Indian River* decision, the Board has the authority to consider this application. Petitioner has conceded that neither the Sussex County Code nor Delaware case law requires a traffic study in order for the Board to consider a special use application.[31] Delaware case law has, however, allowed a Board of Adjustment to rely on permitting agencies to perform their statutory duties to safeguard the public.[32] Here, DelDOT is the appropriate agency to address traffic concerns. DelDOT, in a letter to Harim, has confirmed that it is conducting a traffic impact study, and if need be, necessary changes will be addressed. Therefore, under *Dragon Run Terrace*, it is appropriate for the Board to rely on DelDOT to

---

[30] *Rehoboth Art League, Inc. v. Board of Adjustment of Town of Henelopen Acres*, 991 A. 2d 1163, 1168 (Del. 2010).
[31] Petitioners' Reply Brief at 6, *Protect Our Indian River et al. v. Sussex County Board of Adjustment and Allen Harim Foods, LLC.*, C.A. No. S18A-08-003 RFS (Del. Super. Ct. February 8, 2018).
[32] *Protect Our Indian River*, 2015 WL 4498971, at *14 (citing *Dragon Run Terrace, Inc.*, 222 A. 2d 315, 318 (Del. 1966).

regulate traffic concerns, as it is the proper regulatory body. Petitioners' argument that the Board lacked jurisdiction without a traffic impact study fails for the above mentioned reasons.

*D. The Findings of Fact Reflect the Testimony and Evidence Presented to the Board and Substantial Evidence Exists to Affirm the Board's Decision.*

The Board correctly reflected the testimony and evidence in the Findings of Fact. However, even if the Board did misstate facts the correct legal standard to apply is not whether the Board's decision contains mistakes, but rather whether substantial evidence is on the record to support the Board's decision.[33] In other words, the decision may be upheld unless it is clearly shown that after, accounting for actual mistakes of fact, substantial evidence no longer exists.[34] Petitioners argue that there are a sampling of errors and inconsistencies between the transcript and the Findings of Fact. Specifically, Petitioners state that the following findings of fact are incorrect.

First, Petitioners argue that Fact No. 10 is incorrect because Fact No. 10 states that 40,000 gallons of waste water discharge will be produced per day. Petitioners assert that this figure is an approximation, and that it does not include sanitary sewer waste that will result from the approximately 165 employees working at the facility. However, the Board did not include employee waste water output into the Findings of Fact No. 10 because sanitary sewer waste is addressed by a separate permit and the two are separately treated.[35] Therefore, sanitary sewer waste concerns will be addressed by the proper permitting agency and were not incorrectly stated in the Findings of Fact.

Next, Petitioners argue that Fact No. 10 incorrectly states that there will be no discharge and that DNREC has already approved a waste water permit. Petitioners assert that the waste water

---

[33] *Protecting Our Indian River v. Delaware Department of Natural Resources and Environmental Control*, 2015 WL 5461204, at *11 (Del. Super. Ct. 2015).
[34] *Davis v. Mark IV Transportation*, 2011 WL 6392950, at *3 (Del. 2011).
[35] Hearing Tr. 43:22-44, March 19, 2018.

11

permit is pending approval and has not yet been approved. The relevant portion of Fact No. 10 actually states, "[t]he treated waste water will be discharged via spray irrigation subject to an existing permit application to DNREC. According to the Applicant, DNREC has already approved the wastewater discharge permit but there are other related permits still ongoing." But, the Board did not affirmatively state that DNREC had approved the application. Specifically, the Board stated, "according to the Applicant . . . DNREC approved" and that there are "other related permits still ongoing." Therefore, there is not an inconsistency between the transcript and Findings of Fact about DNREC's waste water permit approval.

Third, Petitioners assert that Fact No. 63(e)(iii) states that there will be only approximately 16 trucks per day. But, Petitioners argue that many more trucks will be needed in order to haul waste water until the spray irrigation system is fully operational. However, the Board acknowledged the actual amount of waste water trucking in Fact No. 57. Fact No. 57 estimates 5-6 trucks per day to transport wastewater off-site whenever Harim is unable to spray irrigate for long periods of time. Furthermore, the Board also has imposed the condition that Harim's spray irrigation system must be upgraded, approved, permitted and operational before the facility is operational. Because Harim is required by the Board to have a fully operational and approved spray irrigation system Petitioners argument fails. Furthermore, the Board also addressed the issue of additional wastewater trucking in times where Harim is unable to use the spray irrigation system. Therefore, there are not inconsistencies between the Board's Findings of Fact and the transcript of the hearing.

Finally, Petitioners argue that Fact No. 63(e)(iii) does not account for the fact that the facility previously was used as a seasonal facility and not year round. The relevant portion of Fact No. 63(e)(iii) states, "[n]otably, the facility will consist of well under half as many employees as when the site was used as a pickle plant." However, the fact that the Board did not state that the pickle

12

plant was a seasonal facility does not undermine the decision. The decision may be upheld unless it is clearly shown that after, accounting for actual mistakes of fact, substantial evidence no longer exists.[36] Here, in addition to operation of the pickle plant, the approved 2013 application included a permit to discharge thirty times as much wastewater per day, included more workers, and called for a greater volume of traffic than the current application. Therefore, substantial evidence still exists on the record despite the Findings of Fact not mentioning that the pickle plant was used only as a seasonal facility.

Based on the testimony and evidence presented to the Board there is substantial evidence in the record to support that this use is appropriate, far less intensive than the previously approved use, and Petitioners have not met their burden to show a lack of substantial evidence.

## V. CONCLUSION

Considering the foregoing, Petitioners failed to satisfy their burden to show that the Board's decision was arbitrary and unreasonable. The Court finds that jurisdiction was properly exercised, the Board did not demonstrate bias, the Findings of Fact properly reflected the testimony and evidence presented, the Board's decision was based on substantial evidence, and the decision was free from legal error. Therefore, the Board's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

---

[36] *Davis*, 2011 WL 6392950, at *3 (Del. 2011).

13